IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

-------------------------------------------------------------------X

UNITED STATES OF AMERICA,

Plaintiff,                                                  CRIM. NO. 21-359 (PAD)(GLS)

-against-

[6] RICARDO LOPEZ-RAMOS,
     also known as "Ricky"
[7] HECTOR L. DERKES,
     also known as "El Venezolano"
[8] WILLIAM J. PANTOJA-NIEVES,
     also known as "W"
[9] LUIS J. HERNANDEZ-CRUZ,
     also known as "Tampa Pana"
[10] EDWIN DANIEL GONZALEZ-REYES,
     also known as "Cotto" and "Coto"
[11] FERNANDO CORTES-FLORES
     also known as "La Bruja"
[12] EMILIANO FELICIANO HERANDEZ,
[17] CHRISTIAN PRADO,
[18] LUIS ALBERTO BOURDON-ROMAN,
     also known as "El Negro Capi Bueno"
[19] EDWIN CANDELARIA-RAMOS,

Defendants

-------------------------------------------------------------------X

## THE GOVERNMENT'S DETENTION MEMORANDUM

W. Stephen Muldrow

United States Attorney

/s/ Jorge L. Matos

Jorge L. Matos
USDC #G-01307
Assistant U. S. Attorney
 Torre Chardón, Suite 1201
350 Carlos Chardón Street
Hato Rey, Puerto Rico 00918
Tel: 787-766-5656
E-Mail: Jorge.L.Matos2@usdoj.gov

# TABLE OF CONTENTS

I.      **INTRODUCTION** ............................................. **Error! Bookmark not defined.**

II.     **APPLICABLE LAW** ........................................ **Error! Bookmark not defined.**

III.    **ARGUMENT** ................................................... **Error! Bookmark not defined.**

    A.  The Court Should Adopt the Magistrate Judge's Determination of the Witnesses' Credibility. ........................................ **Error! Bookmark not defined.**

    B.  The Court Should Adopt the Magistrate Judges Recommendation that the Defendant's Motion to Suppress Evidence Seized from the Dodge TRX be Denied. ............................................................ **Error! Bookmark not defined.**

    a.  The Magistrate Judge Properly Concluded that the Defendant did not have Standing. ......................................................... **Error! Bookmark not defined.**

    b.  The Magistrate Judge Properly Concluded That the Traffic Stop was Legal. ........................................................................ **Error! Bookmark not defined.**

    c.  The Magistrate Judge Properly Found That Reasonable Suspicion Existed to Prolong the Stop ................................................. **Error! Bookmark not defined.**

    d.  The Magistrate Judge Properly Found that Probable Cause Existed to Search The Vehicle. ..................................................... **Error! Bookmark not defined.**

    e.  The Magistrate Properly Concluded that even if the Defendant had standing and the stop was impermissible the Defendant's Consent to Search the Vehicle attenuated any unlawful stop. ............................ **Error! Bookmark not defined.**

    C.  The Magistrate Judge Properly Concluded that the Seizure of the Defendant's Cell Phone was Constitutional and the Defendant's Motion to Suppress Evidence from the Defendant's Cell Phone should be Denied. **Error! Bookmark not defined.**

    a.  The Magistrate Judge Properly Concluded that the Plain View and Exigent Circumstances Doctrines applied to the Seizure of the Defendant's Cell Phone ........................................................................ **Error! Bookmark not defined.**

    b.  The Magistrate Judge properly concluded that an Independent Source Existed ........................................................................ **Error! Bookmark not defined.**

IV.     **CONCLUSION** ................................................ **Error! Bookmark not defined.**

# TABLE OF AUTHORITIES

**Cases**

*Brown v. Illinois,*
  422 U.S. 590 (1975).................................................................................. 11

*Gonzalez-Ramos v. Empresas Berrios, Inc.,*
  360 F. Supp. 2d 373 (D.P.R. March 18, 2005) .................................................... 3

*Illinois v. Rodriguez,*
  497 U.S. 177 (1990).................................................................................. 11

*Sylva v. Cuebra Dive Shope,*
  389 F. Supp. 2d 189  (D.P.R. August 31, 2005) ................................................... 3

*United States v. Cruz-Arroyo,*
  Case No. 17-cr-191 (DRD), Dkt. No. 69, 2019 WL 1282833 (D.P.R. March 19, 2019).4, 6

*United States v. Cruz-Rivera,*
  14 F. 4th 32 (1st Cir. 2021) ....................................................................... 12

*United States v. Fermin,*
  771 F.3d 71 (1st Cir. 2014) ......................................................................... 9

*United States v. Hernandez-Rodriguez,*
  443 F.3d 138 (1st Cir. 2006).......................................................................... 3

*United States v. Jones,*
  700 F.3d 615 (1st Cir. 2012).......................................................................... 9

*United States v. Lopez-Torres,*
  Case No. 17-cr-582 (ADC), Dkt. No. 81, 2022 WL 3443811, (D.P.R. August 16, 2022) .. 3

*United States v. Mendoza-Rolon,*
  326 F. Supp. 2d 243 (D.P.R. July 12, 2004).................................................... 10

*United States v. Morales-Castro,*
  947 F. Supp. 2d 166 (D.P.R. May 30, 2007) ..................................................... 3

*United States v. Raddatz,*
  447 U.S. 667 (1980).................................................................................... 3

*Vega-Feliciano v. Doctors' Center Hosp., Inc.,*
  100 F. Supp. 3d 113 (D.P.R. March 30, 2015) .................................................. 3

## Statutes

18 U.S.C. § 1956(h) ............................................................................... 1

21 U.S.C. § 841(a)(1) ............................................................................ 1

21 U.S.C. § 841(b)(1)(A)(ii) ................................................................. 1

21 U.S.C. § 841(b)(1)(D) ...................................................................... 1

21 U.S.C. § 846 ..................................................................................... 1

28 U.S.C. § 636(b)(1)(A) ...................................................................... 2

28 U.S.C. § 636(b)(1)(C) ...................................................................... 3

## Federal Rules of Criminal Procedure

Fed. R. Crim. P. 59(b)(1) ..................................................................... 2

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this memorandum in support of its application for a permanent order of detention for the defendants [6] RICARDO LOPEZ-RAMOS, also known as "Ricky" [7] HECTOR L. DERKES, also known as "El Venezolano" [8] WILLIAM J. PANTOJA-NIEVES, also known as "W" [9] LUIS J. HERNANDEZ-CRUZ, also known as "Tampa Pana" [10] EDWIN DANIEL GONZALEZ-REYES, also known as "Cotto" and "Coto" [11] FERNANDO CORTES-FLORES also known as "La Bruja" [12] EMILIANO FELICIANO HERANDEZ, [17] CHRISTIAN PRADO, [18] LUIS ALBERTO BOURDON-ROMAN, also known as "El Negro Capi Bueno" [19] EDWIN CANDELARIA-RAMOS, who are leaders, organizers, suppliers, and/or members of the Rodriguez-Cumba Drug Trafficking Organization, which is a multi-district violent drug trafficking organization. The Rodriguez-Cumba Drug Trafficking Organization is led by Jose Julio Rodriguez-Cumba—a co-defendant—who is currently detained at Metropolitan Detention Center—Guaynabo. The Defendants were arrested on December 1, 2023, and are scheduled to appear before the Court on December 1, 2023, for an initial appearance on a sixty-count Superseding Indictment, *United States v. Jose Julio Rodriguez-Cumba, et al.*, 21-cr-359 (PAD)("the Superseding Indictment"). For all the reasons set forth below, pursuant to Title 18, United States Code, Section 3142(e), the defendants' detention pending trial is justified.

<u>DISCUSSION</u>

I.    <u>THE CHARGES</u>

On December 1, 2023, a federal grand jury sitting in the District of Puerto Rico returned the Superseding Indictment—charging the defendants: [1] JOSE JULIO RODRIGUEZ-CUMBA, also known as "Chambi", "Chembi", "Josue", "Chambo", and

"Patron", [3] BARBARA VALENTIN-RIVERA, also known as "Barbara Paola", [4] LUIS CRESPO-CUMBA, also known as "La L" [5] LUIS ROBERTO ALVARADO-REYES, also known as "El Viejo" [6] RICARDO LOPEZ-RAMOS, also known as "Ricky" [7] HECTOR L. DERKES, also known as "El Venezolano" [8] WILLIAM J. PANTOJA-NIEVES, also known as "W" [9] LUIS J. HERNANDEZ-CRUZ, also known as "Tampa Pana" [10] EDWIN DANIEL GONZALEZ-REYES, also known as "Cotto" and "Coto" [11] FERNANDO CORTES-FLORES also known as "La Bruja" [12] EMILIANO FELICIANO-HERNANDEZ, [13] LUIS HECTOR ADAMES-NIEVES, also known as "Monki" [14] ANGEL XAVIER PEREZ-OLIVENCIA, also known as "Chavy" [15] NIURKA A. RODRIGUEZ-CUMBA, also known as "Adela" [16] MARTA D. CARDONA-CUMBA, [17] CHRISTIAN PRADO, [18] LUIS ALBERTO BOURDON-ROMAN, also known as "El Negro Capi Bueno" [19] EDWIN CANDELARIA-RAMOS with various counts related to the Rodriguez-Cumba Drug Trafficking Organization. The Indictment which spans over eight years—charges the Defendants in Count One with Conspiracy to Possess with Intent to Distribute a Controlled Substance in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(A)(ii), and 846, for the Defendants role in the Rodriguez-Cumba Drug Trafficking Organization; Possession with Intent to Distribute a Controlled Substance in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(A)(ii), for the Defendants possession of approximately one hundred kilograms of cocaine on September 10, 2021; Count Three with Possession with Intent to Distribute a Controlled Substance in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(D), for the Defendant's possession of approximately forty-two kilograms of marijuana on September 10, 2021.

If convicted of Counts Two, Three, Four, alone, the Defendant faces a mandatory minimum sentence of ten-years imprisonment with a maximum sentence of life imprisonment.

## II.   FACTUAL BACKGROUND

As permitted by the First Circuit, the government proceeds by factual proffer in support of its motion for a permanent order of detention. *See United States v. Acevedo-Ramos*, 755 2d 203, 207-209 (1st Cir. 1985). As this proffer seeks only to articulate facts sufficient to justify detention, it is not a complete statement of all of the evidence of which the government is aware or will seek to introduce at trial.

The Superseding Indictment is the result of a long term investigation conducted by the Department of Homeland Security—Homeland Security Investigations, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), the United States Postal Service Office of Inspector General ("USPS-OIG"), United States Postal Inspectors ("USPIS"), Federal Bureau of Investigation ("FBI"), the Drug Enforcement Administration ("DEA"), and the United States Attorney's Office for the District of Puerto Rico ("USAO"), as part of the Organized Crime Drug Enforcement Task Force ("OCDETF"). The OCDETF investigation has yielded among other things, court authorized searches of electronic devices revealing written and audio messages between the defendants' and the Jose Julio Rodriguez-Cumba, the seizure of over a bulk ton of cocaine, the seizure of dozens of firearms, documentary evidence including business, telephone, property, domiciliary records, and financial records revealing millions of dollars in money laundering transactions. The OCDETF investigation also revealed numerous attempts by various defendants to obstruct the investigation by either destroying or removing evidence or concealing property and funds subject to forfeiture.

In March 2019, Department of Homeland Security Investigations ("HSI") initiated an investigation into a drug trafficking organization that utilized the United States Postal Service to mail packages containing cocaine to the continental United States. Information received by HSI agents from the USPIS indicated that Barbara Valentin-Rivera was a member of the drug trafficking organization and that she shipped packages containing cocaine through the United States Postal Service to members of the organization located in New York, Connecticut, and Florida. The packages would contain kilogram quantities of cocaine. Members of the organization would store the proceeds of the cocaine sales in various stash houses and make periodic commercial flights returning to either Puerto Rico or Florida with million dollar sums of United States currency stored in suitcases, which would eventually be laundered back into the organization. Within the District of Puerto Rico, the Rodriguez-Cumba Drug Trafficking Organization would routinely employ violence.

*September 9, 2021—2.2 Million Dollar Bulk Cash Seizure at Miami International Airport from the Rodriguez-Cumba Drug Trafficking Organization*

On September 9, 2021, HSI agents, assigned to the Miami International Airport ("MIA"), seized $2,218,620 United States currency in bulk cash from Alavardo-Reyes and Jose Cotto-Torres ("Cotto-Torres"), both known members of Julio Jose Rodriguez-Cumba's organization. The currency was hidden inside four suitcases transported from New York to Miami onboard JetBlue flight 2293.

Alvarado-Reyes signed a "Notice of Abandonment and Assent to Forfeiture of Prohibited or Seized Merchandise" from the Department of Homeland Security at the airport. The abandoned merchandise was two "silver traveler's choice medium suitcases with name of Luis Alvarado with unknown amount of U.S. Currency contained within." Alvarado-Reyes' suitcases had a total of $1,304,920.00. Additionally, Cotto-Torres also signed a

4

"Notice of Abandonment and Assent to Forfeiture of Prohibited or Seized Merchandise" from the Department of Homeland Security at MIA. The Abandoned Merchandise were "1 black bonjour suitcase and 1 silver/gray suitcase swiss gear with jeans and US currency." Cotto-Torres' suitcases had a total of $913,775.00.

After a court-authorized search of a cellular telephone seized from Rodriguez-Cumba—a WhatsApp exchange was identified between Rodriguez-Cumba and Alvarado-Reyes—using the same telephone number Alvarado-Reyes had identified as his to the Miami HSI Agents—dated on or about September 9, 2021, discussing the logistics of transporting the $2,218,620.00 from New York to Miami.

Before the currency's transportation to Miami, it was stored and packaged at 1750 Sedgewick, in Bronx County, an address associated with the Defendant. *See* ECF No. 110 at 2.

*September 10, 2021—Seizure of 100 Kilograms of Cocaine*

On September 10, 2022, at approximately 5:00 a.m. at one of Rodriguez-Cumba's residence at Urb. La Llamarada in Moca, Puerto Rico (hereinafter "the Residence").

At approximately, 11:45 a.m., a 2016 black Honda Pilot, bearing Puerto Rico license plate number JRN-144 ("Honda Pilot"), arrived and parked in the driveway of the Residence. The subject driving the black Honda Pilot was later identified as the Defendant.

At approximately 1:00 p.m., HSI agents observed Rodriguez-Cumba and another individual place suitcases in a 2021 white Dodge Ram TRX, bearing Puerto Rico license plate number 1083581 (the "Dodge TRX"). Based on the agents training and experience—the placing of the suitcases in the Dodge TRX was indicia of another common method of smuggling cocaine to the continental United States. HSI Agents also observed, the Defendant

leave the Residence in the Honda Pilot. While exiting the area, Rodriguez-Cumba drove the Dodge TRX above the speed limit and with a driving style with which the investigative team could not keep pace—based on their training and experience this driving was consistent with counter-surveillance tactics employed by narcotic traffickers.

At approximately 1:20 p.m., in the vicinity of PR Road No. 2, Km. 108.3, Puerto Rico Police Bureau ("PRPB") Officer Vives who was on routine patrol observed the Dodge TRX traveling from Isabela towards Arceibo, merge into the "right turn only" lane, and accelerate straight through a red light while the driver—Rodriguez-Cumba—was on their cell phone. Based on these observations PRPB Officer Vives—using lights and sirens—conducted a traffic stop of the Dodge TRX—driven by the Rodriguez-Cumba—for violations of Puerto Rico's Traffic Law. The Dodge TRX stopped right away. PRPB Officer Vives approached the Dodge TRX and identified himself to the driver—the Rodriguez-Cumba—and informed him of the reasons for the stop. During the stop, PRPB Officer Vives asked the Rodriguez-Cumba for his license and registration. At approximately, 1:30 p.m. PRPB Officer Vives issued citations to Rodriguez-Cumba for going through a red light and driving while using his cell phone. Based on the investigative teams' prior observations of the Rodriguez-Cumba and the Defendant that were consistent with narcotics trafficking, the investigative team detained the Dodge TRX.

At approximately, 1:53 p.m. PRPB Officer Vives brought a canine—that was in the police vehicle that initially stopped the Rodriguez-Cumba—around the Dodge TRX and the canine alerted to the presence of narcotics in the Dodge TRX. Members of the investigative team called for a tow truck so the Dodge TRX could be brought to a PRPB station and searched away from the road.

At approximately 3:42 p.m. a flat-bed truck arrived to transport the Dodge TRX to the Quebradillas Municipal Police Station. During a consensual interview— in the presence of the Rodriguez-Cumba's local attorney—Rodriguez-Cumba stated in sum substance that he was traveling to Caguas to pick up his girlfriend and that he had a flight out of Luis Munoz Marin International airport at 5:25 p.m. At the station at approximately 4:25 p.m., and in the presence of Rodriguez-Cumba's local attorney the Rodriguez-Cumba signed a consent to search form for the Dodge TRX. During the consent search of the Dodge TRX, agents seized (1) $24,620 United States currency; (2) one gold bracelet; (3) one gold ring; (4) one wristwatch; (5) one Rolex Oyster Perpetual wristwatch; (6) one gold neck chain; (7) one red cylindrical jewelry case; (8) one red rectangular case; and (9) one ring with a red dot.

During the course of these events, the Defendant and Rodriguez-Cumba engaged in at least seven separate phone calls.[1]

Parallel to the traffic stop, at approximately 2:30 p.m. the HSI agents that were still conducting surveillance at the Residence, once again observed the Defendant arrive in the Honda Pilot. This time, agents observed the Defendant frantically run into the Residence to start removing black plastic bags, and cardboard boxes. As the Defendant would exit the Residence with items, he would immediately place said items into the Honda Pilot. The Defendant made multiple trips between the Residence and the Honda Pilot. Based on the

---

[1] At 2:26 p.m. Rodriguez-Cumba received a 9 second phone call from the Defendant. At 2:28 p.m. Rodriguez-Cumba received a 21 second phone call from the Defendant. At 2:39 p.m. Rodriguez-Cumba placed a 16 second call to the Defendant. At 2:46 p.m. the Rodriguez-Cumba placed a 7 second phone call to the Defendant. At 2:47 p.m. Rodriguez-Cumba placed an 11 second phone call to the Defendant. At 2:49 p.m. the Defendant placed a 22 second phone call to the Defendant. At 2:51 p.m., Rodriguez-Cumba placed a 22 second phone call to the Defendant.

training and experience of law enforcement officers observing these acts, Jimenez-Cubero appeared to be removing illicit items.

As soon as the Defendant departed in the Honda Pilot, it appeared that he noticed the presence of the agents in the area and abruptly stopped the Honda Pilot, between fifty to seventy-five feet away from the Residence. The Defendant closed the door and left the Honda Pilot abandoned at one of the adjacent streets.

Thereafter an HSI agent applied for a federal search warrant authorizing a search of the Honda Pilot, and at approximately 9:28 p.m. HSI agents conducted a court-authorized search of the Honda Pilot and seized approximately forty-two kilograms of marijuana, seventy kilograms of cocaine, and various forms of identification of the Defendant from the Honda Pilot that the Defendant was driving and subsequently abandoned.[2]

At 10:52 p.m., another federal search warrant was authorized for the Residence from where the Defendant was removing items and placing them into the Honda Pilot. HSI agents retrieved from inside the Residence approximately thirty kilograms of cocaine in brick shapes some of which were practically identical in branding to the brick shapes found in the Honda Pilot.[3] In addition, agents seized in the house approximately thirty-five thousand dollars and what appeared to be several expensive jewelry pieces such as Rolex watches and diamonds' necklaces. In total on September 10, 2021, members of the investigative team recovered approximately 100 kilograms of cocaine from both the Residence and the Honda Pilot.

---

[2] On September 10, 2021, the Honorable Marshal D. Morgan, Magistrate Judge for the District of Puerto Rico authorized a search of the Honda Pilot. Case No. 21-mj-1125 (D.P.R. September 10, 2021).
[3] On September 10, 2021, the Honorable Marshal D. Morgan, Magistrate Judge for the District of Puerto Rico authorized a search of the Residence. Case No. 21-mj-1126 (D.P.R. September 10, 2021).

The Rodriguez-Cumba Drug Trafficking Organization is responsible for multiple murders in the District of Puerto Rico. For example, on October 15, 2020, members of the Drug Trafficking organization murdered Freddie Charon Valentin a.k.a. "Baby Boy" and one other individual in Mayaguez, Puerto Rico. During the shooting an associate of the Rodriguez-Cumba Drug Trafficking Organization—Richard Nieves-Alvaran also known as "Vampi"—was shot and killed. On October 18, 2020, the Defendant released a song titled, "RIP RICHARD (VAMPI)" on the Defendant's YouTube page.[4]

The Rodriguez-Cumba Drug Trafficking Organization also employed what Rodriguez-Cumba referred to as "mis ninos," or "my kids" who acted as both hitmen and bodyguards and were paid in both United States currency and marijuana. They were responsible for both protecting Rodriguez-Cumba and engaging in violence on behalf of the Rodriguez-Cumba Drug Trafficking Organization.

To date members of the investigative team have seized at least five firearms from the Rodriguez-Cumba Drug Trafficking Organization.

*The Defendants Flight from the Indictment and the Jurisdiction to New York*

After the return of the Indictment the Defendant fled the District of Puerto Rico and went to New York. The Pretrial Services report states, "once the defendant knew that he was wanted by the authorities, he told his mother he was going to leave the house so she wouldn't be involved in any problems. During months, he left for New York and Ms. Cubero Landin

---

[4] https://www.youtube.com/watch?v=SY3azOsqnCs (retrieved May 2, 2022)

reportedly had no contact or knowledge of the defendant's exact whereabouts." ECF No. 110 at 2.

Additionally, on October 5, 2021, at approximately 6:00 p.m. HSI agents received alerts from the Autoexpreso—a system for automatic payment of tolls—that located the Defendant's vehicle as crossing the toll's plazas in highway 22 from Arecibo to San Juan. HSI agents located and conducted a vehicle stop on the Defendant's registered vehicle a Jeep Grand Cherokee at approximately 8:00 p.m. The Jeep Grand Cherokee was being driven by Luis A. Martinez-Concepcion ("Martinez-Concepcion"). HSI agents asked Martinez-Concepcion about Jimenez-Cubero, and he denied knowing the Defendant. HSI agents asked Martinez-Concepcion for consent to search the Grand Cherokee and Martinez-Concepcion authorized and signed an HSI consent to search document at approximately 8:35 p.m. HSI agents encountered a concealed motorized false compartment located under the center console of the Jeep Grand Cherokee. HSI agents transported Martinez-Concepcion and the Jeep Grand Cherokee to the Barceloneta Municipal Police station for further processing.

Later that night, HSI agents read Martinez-Concepcion *Miranda* Rights. Martinez Concepcion waived those rights and agreed to talk to the agents. Martinez-Concepcion originally denied knowing the Defendant, but after giving consent to search his phone Martinez-Concepcion admitted that he knew the Defendant but denied having seen him recently and also stated that he had purchased the Grand Cherokee from Cosme Auto Service in Arecibo, Puerto Rico.

On October 6, 2021, HSI agents obtained title information from CESCO Arecibo via subpoena and discovered that the title process was made and signed by attorney/notary Nicole Cosme-Crespo. HSI agents interviewed attorney/notary Nicolle Cosme-Crespo who

stated and confirmed that she was the notary who authorized the vehicle title transfer between Martinez-Concepcion and the Defendant. She further advised that the Defendant and Martinez-Concepcion arrived in the Jeep Grand Cherokee and were together at the time of the title transfer at the attorney's office in Arecibo, Pueto Rico.

On February 8, 2022, The United States Attorney filed an information against Martinez-Concepcion charging him with one count of lying to a federal officer in violation of 18 U.S.C. § 1001(a)(2), and on that same date he pleaded guilty to the information.

On November 9, 2021, members of the investigative team spoke with the Defendant's father who stated in sum and substance, that the Defendant was taking care of stuff in the streets and as soon as he took care of it, he would surrender himself to the authorities.

*Arrest of the Defendant*

On April 19, 2022, HSI agents—in a continuing effort to locate the Defendant— followed the Defendant's wife, to an Ecomax gas station in the vicinity of Carretera #2, in Aguarda, Puerto Rico. HSI agents observed the Defendant leave a gray Toyota sedan and as the Defendant exited the Sedan, the agents arrested him pursuant to the federal arrest warrant. ECF No. 5. HSI agents recovered search incident to Jimenez-Cubero's arrest recovered a cellular telephone, from his left pant pocket.[5]

During processing, the Defendant stated in sum and substance, that he went to the Residence, took the items out of the Residence, and left it and went off walking. I thought I was being followed and you let me go. The Defendant asked members of the investigative

---

[5] On April 22, 2022, the Honorable Camille L. Vélez-Rivé, Magistrate Judge for the District of Puerto Rico authorized a search of the Defendant's cellular telephone. Case No. 22-mj-456 (D.P.R. April 22, 2022).

team, "why you guys didn't stop me at the moment?"  The Defendant further volunteered that he would have surrendered himself on either May 28th or May 29th.

III.    LEGAL STANDARD
        a. The Bail Reform Act

Under the Bail Reform Act, 18 U.S.C. § 3142 et seq., in cases where a defendant is charged with "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act," a court must presume, "subject to rebuttal by the person," that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community," if the court finds probable cause to believe that the person committed such offense. 18 U.S.C. § 3142(e)(3)(A). Regardless of whether the presumption applies, such probable cause may be established by an indictment, such that there is no need for an independent judicial probable cause determination. *United States v. Contreras*, 776 F.2d 51, 54-55 (2nd Cir. 1985).

If a presumption of detention is applicable, the defendant bears the burden of rebutting that presumption by introducing some evidence to the contrary.  *See United States v. O'Brien*, 895 F.2d 810, 814-815 (1st Cir. 1990).  The government must ultimately persuade the court by a preponderance of the evidence that the defendant is a flight risk.  *United States v. Jackson*, 823 F.2d 4, 5 (2nd Cir. 1987); *United States v. Chimurenga*, 760 F.2d 400, 405 (2nd Cir. 1985).

Detention based on danger to the community must "be supported by clear and convincing evidence." *See* 18 U.S.C. § 3142(f).  The Bail Reform Act lists four factors to be considered in the detention analysis whether for risk of flight or dangerousness: (1) the nature and circumstances of the offense charged; (2) the history and characteristics of the defendant; (3) the seriousness of the danger posed by the defendant's release; and (4) the evidence of the

defendant's guilt. *See* 18 U.S.C § 3142(g). At a detention hearing, the government may proceed by proffer. *United States v. Acevedo-Ramos*, 755 2d 203, 207-209 (1st Cir. 1985).

The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "it is clear that the harm to society caused by narcotics trafficking is encompassed within Congress' definition of danger." *See United States v. Caraballo*, 47 F. Supp.2d 190, 191-193 (D.P.R. March 29, 1999) (quoting *United States v. Leon*, 766 F.2d 77, 81 [2nd Cir. 1985]).

## b. Organized Crime Defendants and Drug Trafficking Organizations

In keeping with this Congressional purpose, pretrial detention is warranted where defendants, are leaders or high-ranking members of a criminal organization whose activities routinely include violence and threats of violence. *See United States v. Patriarca*, 948 F 2d 789, 795 (1st Cir. 1991)("Membership in, and leadership of, a Mafia Family are undoubtedly 'highly relevant considerations' in the pretrial detention analysis."); *United States v. Colombo*, 777 F.2d 96, 99 (2nd Cir. 1985); *United States v. Bellomo*, 944 F. Supp. 1160, 1166 (S.D.N.Y. 1996) (stating that "leader of a criminal enterprise with the ability to order members of the enterprise to engage in [violence] may be a danger to the community" even if he did not engage in the violence himself) (citing *Colombo*, 777 F.2d at 98-99)). In *United States v. Salerno*, in ordering the detention of two leaders of the Genovese organized crime family, the court observed that:

> The activities of a criminal organization such as the Genovese Family do not cease with the arrest of its principals and their release on even the most stringent of bail conditions. The illegal businesses, in place for many years, require constant attention and protection, or they will fail. Under these circumstances, this court recognizes a strong incentive on the part of its leadership to continue business as usual. When business as usual involves threats, beatings, and murder, the present danger such people pose in the community is self-evident.

631 F. Supp. 1364, 1375 (S.D.N.Y. 1986), order vacated, 794 F.2d 64 (2nd Cir.), order reinstated, 829 F.2d 345 (2nd Cir. 1987).

Similarly, in *Colombo*, the captain of a crew in the Colombo organized crime family was ordered detained because the operation of that organization posed a "risk to the public" and a "danger to the community" by its "consistent pattern of orchestrating a series of violent criminal operations." 777 F.2d at 99 (internal quotation marks omitted).

Congress noted that defendants pose a danger to the community not only when they commit acts of violence, but also when it is likely that they will commit even non-violent crimes that are detrimental to the community. *See* S. Rep. No. 225 98th Cong., 1st Sess. at 6-7, as reprinted in 1984 U.S. Code Cong. & Admin. News 3182 ("Senate Report"), 3195 ("[L]anguage referring to safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community . . . . The Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence.").

Additionally, the First Circuit has recognized that drug trafficking also poses specials concerns regarding risk of flight. *United States v. Palmer-Contreras*, 835 F 2d 15, 17 (1st Cir. 1987)("drug traffickers pose special flight risks"). The First Circuit in recognizing the presumption's application in drug cases with large amounts of kilograms found,

> Pointing to their strong family ties to Puerto Rico, their meager financial resources, the absence of any prior drug related arrests or convictions, and their minor roles as mules, defendants contend that the district court misapplied § 3142(e)'s presumption and concluded that mere possession of drugs is sufficient ground for detention. We disagree with defendants' interpretation of the district court's detention order. This is no ordinary drug case. Rather, defendants were caught with 195 kilos of cocaine valued at $37,000 to $40,000 per kilo, that is to say, over $7 million worth of cocaine. The large amount of drugs supports the court's inference (for detention purposes) that defendants are connected to persons or an organization with great financial resources, an organization which could finance defendants' relocation. The forfeiture of $100,000 worth

of property would have little financial impact on such an organization. In other words, defendants or the persons with whom they are associated would appear to be involved in the " 'highly lucrative' drug operations at the center of congressional concern" and thus be persons at whom the § 3142(e) presumption is aimed. *Jessup*, 757 F.2d at 386. If, indeed, as the district court concluded, the evidence against defendants is strong, the incentive for relocation is increased.

*Id* at 18.

      c.   <u>Elaborate Bail Packages and Electronic Monitoring are Insufficient to Protect the Communication Against Organized Crime and Drug Trafficking Organizations</u>

Further, the First Circuit has a dim view of elaborate bail packages for defendant's who pose a danger to the community as they rely on the good-faith of the defendants. *See United States v. Moreno*, 30 F. 2d 127 (Table), 2-3, unpublished (1st Cir. 1994) (As the government argues, the proposed custodians and conditions easily manipulated and their effectiveness hinges on the defendant's good faith. They thus fall far short of providing the needed, 'objectively reasonable assurance of community safety'"). In *United States v. Tortora*, the First Circuit held,

> They are admittedly elaborate and extensive. But they have an Achilles' heel: if there is a unifying theme in this intricate set of restrictions, it is that virtually all of them hinge on the defendant's good faith compliance. To illustrate, electronic monitoring, while valuable in pretrial release cases (especially in allowing early detection of possible flight), cannot be expected to prevent a defendant from committing crimes or deter him from participating in felonious activity within the monitoring radius. Second, by allowing outside visits to doctors and lawyers, the conditions open up a sizeable loophole; there is no feasible way of assuring that Tortora, while en route to and from such appointments, will not make stops and take detours with a view toward continuing his criminal life. House arrest poses much the same problem; limiting visitors can only work, for example, if the appellee submits the names of potential guests for clearance. The only enforcement mechanism provided to ensure that Tortora properly restricts his contacts is a requirement that Tortora keep a record of those contacts-a mechanism which, itself, is honor-dependent. Finally, the monitoring of Tortora's sole telephone line can be easily evaded by, say, the surreptitious introduction into his home of a cellular

> telephone or stopping at a pay telephone while headed for an authorized appointment.
>
> Consequently, we find that the conditions as a whole are flawed in that their success depends largely on the defendant's good faith-or lack of it. They can be too easily circumvented or manipulated. Such a flaw takes on great significance where, as in this case, little about the defendant or his history suggests that good faith will be forthcoming. If past is prologue, then promises to hew the straight and narrow will mean next to nothing to this defendant. In our estimation, the conditions fail to offer an objectively reasonable assurance of safety to the community.

*United States v. Tortora*, 922 F.2d 880, 886-887 (1st Cir. 1990). In addition to the First Circuit, other circuits have rejected elaborate bail packages. *See United States v. Ferranti*, 66 F.3d 540, 543-544 (2nd Cir. 1995) (rejecting $1 million bail package secured by real property); *United States v. Orena*, 986 F.2d 628, 630-33 (2nd Cir. 1993) (rejecting $3 million bail package secured with real property, home detention, restricted visitation and telephone calls, and electronic monitoring); *Colombo*, 777 F.2d at 97, 100 (rejecting $500,000 bail package secured by real property).

IV.    THE DEFENDANTS SHOULD BE DETAINED PENDING TRIAL
A. A Presumption of Detention Applies

This case involves offenses for which there is a presumption that no combination of conditions will reasonably assure the Defendant's appearance or the safety of the community. *See* 18 U.S.C. § 3142(e)(3). Each of the defendants is charged with at least count under the Controlled Substances under the Controlled Substances Act for which the statutes prescribe a minimum mandatory sentence of ten-years imprisonment and a maximum life sentence based upon the Defendant's role in the offense together with the quantity of drugs. *See* 18 U.S.C. § 3142(e)(3)(A). Accordingly, the defendants bears the initial burden of showing that he would be neither a danger to the community nor a flight risk. For the reasons set forth below, that burden cannot be sustained.

B.  The Defendants are a Danger to the Community

The facts and circumstances of this case compel the Defendant's detention, as all four factors set forth in Section 3142(g) show that he poses a danger to the community.

1. [6] RICARDO LOPEZ-RAMOS,
   a.  The Nature and Circumstances of the Offenses Charged

As detailed above, the Defendant's is a high-level member in an organization responsible for hundreds of kilograms of cocaine which causes thousands of deaths each year.[6] The Defendant helps oversee a cocaine distribution infrastructure in Puerto Rico that brings cocaine to Florida, New York, and Connecticut and obtains multi-millions in cash profits. The seventy kilograms of cocaine recovered just from the Honda pilot have a value in Puerto Rico of over 1.2 million dollars.

As in *Columbo* and *Patriarca*, the Defendant's position as a high-ranking member within the Rodriguez-Cumba Drug Trafficking Organization warrants detention. *See United States v. Colombo*, 777 F.2d 96, 99 (2nd Cir. 1985); *United States v. Patriarca*, 948 F 2d 789, 795 (1st Cir. 1991). The organization is responsible for multiple murders and this organization poses a "risk to the public" and a "danger to the community" by its "consistent pattern of orchestrating a series of violent criminal operations." *Id.* at 99. When it became apparent that members of law enforcement were surveilling him on September 10, 2021, Rodriguez-Cumba called the Defendant and entrusted him to remove kilograms of cocaine worth over a million dollars from Rodriguez-Cumba's residence. The Defendant was also responsible for overseeing activities of the organization in New York and Connecticut. This is demonstrated

---

[6] https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates (retrieved September 23, 2023)("2019 to 2021, cocaine-involved deaths rose nearly 54% to 24,486 death")

by the residences that appear in the Pretrial Services Report in both Connecticut and the Bronx. ECF No 110 at 2.

Additionally, multiple firearms have been recovered from the Rodriguez-Cumba Drug Trafficking organization including a modified machine-gun. The Defendant does not have a weapons permit that would justify possession of any of these weapons or the weapons he displays in his music videos. ECF No. 110 at 4.

Thus, based upon the Defendant's involvement in the Rodriguez-Cumba Drug-Trafficking organization, the nature and the circumstances of the charged offenses justify detaining the Defendant as a danger to the community.

### b. The Weight of the Evidence

The weight of the evidence against the Defendant overwhelmingly supports detention. The charges in the Superseding Indictment will be proven with a variety of evidence acquired through in-depth investigations into the Defendant and the Rodriguez-Cumba Drug Trafficking Organization, not only in Puerto Rico but throughout the East Coast of the continental United States.

### i. Physical Evidence

The government will prove its case against The Defendant through physical evidence. The government recovered approximately seventy kilograms of cocaine from a vehicle that the Defendant loaded with bags and subsequently abandoned. The Defendant's flight from the Honda Pilot—where members of the investigative team recovered seventy kilograms of cocaine—is video recorded, and the Defendant can be identified through his extensive tattoos. Through the execution of the second search warrant at the Residence where members of the investigative team recovered kilograms of cocaine matching the branding recovered from the

Honda Pilot. The government recovered drug ledgers from the search warrant, which detail the financial agreements between members of the Rodriguez-Cumba Drug Trafficking organization, including the Defendant who is listed under his alias "Dogi", and others. There will also be evidence produced through extensive physical surveillance on the date where the Defendant fled from the Honda Pilot. All told, the violations set forth in the Indictment incorporate 100 kilograms of seized cocaine.

ii.   <u>Court-Authorized Searches of Electronic Devices</u>

The Defendant's guilt will also be established through court-authorized searches of electronic devices. For example, law enforcement has identified WhatsApp text, video, and audio communications between a WhatsApp Account listed as "Jose Rodriguez-Cumba" and a WhatsApp account "Doggi Bueno" associated with "13474303418" and a picture of the Defendant. In those communications, despite offering no assets, there are photographs of currency counters. There is a video of currency in the number in the tens of thousands of dollars. There are photographs of packages and associated shipping information that is consistent with the modus operandi of the Rodriguez-Cumba Drug Trafficking Organization. There are photographs of flight information to New York, where the Defendant oversaw the receipt side of the Rodriguez-Cumba Drug Trafficking Organization. There are additionally, seven phone calls between the Defendant and Rodriguez-Cumba on September 10, 2021, after Rodriguez-Cumba was stopped and before the seizure of seventy kilograms of cocaine from the Honda pilot.

The weight of the evidence substantiates the Defendant's role as a high-ranking and trusted member of the violent Rodriguez-Cumba Drug Trafficking Organization.

c. <u>The History and Characteristics of the Defendant</u>
  i. <u>The Defendant's Lack of Employment and Music Videos</u>

The Defendant has no listed employment for the past year and stated that he is a music producer and singer. ECF No. 110 at 3. The Defendant has posted a series of music videos on YouTube where the Defendant's music videos consistently display the Defendant possessing various firearms, scenes depicting robberies, carjackings, and murders.[7]

The Defendant's music videos would not only go to the Defendant's character, but parts would be admissible at trial against the Defendant. The First Amendment does not, "prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993). "Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like." *Id.* "Rap lyrics and tattoos are properly admitted, however, where they are relevant, and their probative value is not substantially outweighed by the danger of unfair prejudice." *See United States v. Moore,* 639 F.3d 443, 447–448 (8th Cir.2011) (affirming admission of profane and violent rap recordings over Fed.R.Evid. 403 challenge where lyrics were probative of defendant's participation in narcotics conspiracy); *United States v. Belfast, 611 F.3d 783, 820 (11th Cir.2010)* (holding that rap lyrics were relevant and their probative value not substantially outweighed by any unfair prejudice in case where lyrics were used to show that defendant was associated with his father Charles Taylor's Anti–Terrorism Unit, which tortured Sierra Leoneans in Liberia). *See United States v. Pierce*, 785 F. 3d 832, 840-841 (2nd Cir. 2015).

---

[7] https://www.youtube.com/user/eldoggyman79 (retrieved May 2, 2022)

In a music video titled "REZO" the Defendant can be observed with three distinct pistols, including one with an extended magazine. Throughout the music video the Defendant is on a chair displaying multiple firearms for the camera, surrounded by masked individuals carrying automatic and semi-automatic weapons. The video subplot depicts multiple masked individuals gathering in a vehicle, preparing to carjack a vehicle, eventually carrying out the carjacking and in the process of executing the carjacking a masked individuals shoots the driver.

Throughout the music video the Defendant alludes to firearms—at one point he states, "Rifles sound like batteries in a Skrillex track. I'll put some inside of you while chilling and then do my time like meek milly. You guys don't know the meaning of *power*. And if you guys confront me, we'll be here waiting for you 24 hours." The Defendant states that he would shoot someone and do his prison time like Philadelphia area rapper Meek Mill who was sentenced to years in prison and a lengthy probation after being convicted of gun possession.[8] Later the Defendant raps, "The Eddie Bauer, the rods and the sig Sauer. I'll explode you like a baby shower balloon." *Id.* A Sig Sauer is a brand of a firearm, and the Defendant's reference to a ballon is a reference to shooting someone. The Defendant plainly states, "That's why I don't even go to my mailbox without my gun." *Id.* Additionally, the Defendant suggests, "May god forgive me, but I am not going down because of a son of a bitch"

---

[8] https://www.rollingstone.com/music/music-news/meek-mills-legal-troubles-a-history-117981/ (retrieved May 2, 2022)

The Defendant also alludes to importation of cocaine stating, "Boats arrive through the coast." This is a common method of drug trafficking in the District of Puerto Rico, as small vessels will arrive on the shoreline and transport hundreds of kilograms at a time.

In another public music video, titled "La Pistola" the Defendant is carrying what appears to be a gold-plated semi-automatic pistol. The plot of the music video depicts a masked individual with a revolver chasing down another individual and shooting him.[9] In another music video titled "Confia" the Defendant is seen holding another pistol.[10]

Not only do the Defendant's music videos prove his familiarity with firearms, his membership in the narcotics conspiracy, pay tribute to deceased associates, but they glorify carjacking—a danger to the community that has plagued the District of Puerto Rico.[11]

Additionally, the last video posted to the ElDoggyTv account was posted on September 5, 2021, a mere five days before the Defendant abandoned the Honda Pilot with approximately seventy kilograms of cocaine.

  ii. <u>The Defendant's Drug Use and Criminal History</u>

Not only is the Defendant unemployed but the Defendant smokes fifteen marijuana cigarettes a day and has a history of substance abuse where he took twenty-five pills a day of Percocet which contains oxycodone. ECF No. 110 at 3. The Defendant was also arrested and charged with Article 401 of the PR Controlled Substances law in 2015. *Id* at 4.

  iii. <u>The Defendant's Concealment of Assets</u>

---

[9] https://www.youtube.com/watch?v=8qR607L-7Uo (retrieved May 2, 2022)
[10] https://www.youtube.com/watch?v=WxiNuI8f9Ec (retrieved May 2, 2022)
[11] https://www.justice.gov/usao-pr/pr/carjacking-prevention-campaign (Retrieved April 26, 2022)

The Defendant did not report any assets, liabilities, income or expenses to probation. ECF No. 110 at 3. The Defendant was not forthcoming with probation about the assets that he has received from his involvement in the Rodriguez-Cumba drug trafficking organization. The Defendant's failure to report these assets demonstrate the Defendants willingness to conceal his assets even after having been arrested.

### d. The Nature and Seriousness of the Danger Posed by Release

As detailed above, the Defendant's release poses a danger to the community. Once he is no longer burdened by his flight from the Indictment, the Defendant will be able to assist Rodriguez-Cumba in continuing the drug trafficking organization while Rodriguez-Cumba remains detained pending trial. On April 21, 2022, a grand jury sitting in the District of Puerto Rico returned a one count indictment—22-cr-173—charging Rodriguez-Cumba with Possessing Contraband in Prison. The contraband associated with the one count is a cellular telephone that Rodriguez-Cumba had while detained at MDC—Guaynabo.

Detaining the Defendant pending trial will dramatically reduce the risk that he will continue his work on the "streets." For those reasons, no conditions or combination of conditions can assure the safety of the community.

### 2. [7] HECTOR L. DERKES,

### a. The Nature and Circumstances of the Offenses Charged

As detailed above, the Defendant's is a high-level member in an organization responsible for hundreds of kilograms of cocaine which causes thousands of deaths each year.[12] The Defendant helps oversee a cocaine distribution infrastructure in Puerto Rico that

---

[12] https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates (retrieved September 23, 2023)("2019 to 2021, cocaine-involved deaths rose nearly 54% to 24,486 death")

brings cocaine to Florida, New York, and Connecticut and obtains multi-millions in cash profits. The seventy kilograms of cocaine recovered just from the Honda pilot have a value in Puerto Rico of over 1.2 million dollars.

As in *Columbo* and *Patriarca*, the Defendant's position as a high-ranking member within the Rodriguez-Cumba Drug Trafficking Organization warrants detention. *See United States v. Colombo*, 777 F.2d 96, 99 (2nd Cir. 1985); *United States v. Patriarca*, 948 F 2d 789, 795 (1st Cir. 1991). The organization is responsible for multiple murders and this organization poses a "risk to the public" and a "danger to the community" by its "consistent pattern of orchestrating a series of violent criminal operations." *Id.* at 99. When it became apparent that members of law enforcement were surveilling him on September 10, 2021, Rodriguez-Cumba called the Defendant and entrusted him to remove kilograms of cocaine worth over a million dollars from Rodriguez-Cumba's residence. The Defendant was also responsible for overseeing activities of the organization in New York and Connecticut. This is demonstrated by the residences that appear in the Pretrial Services Report in both Connecticut and the Bronx. ECF No 110 at 2.

Additionally, multiple firearms have been recovered from the Rodriguez-Cumba Drug Trafficking organization including a modified machine-gun. The Defendant does not have a weapons permit that would justify possession of any of these weapons or the weapons he displays in his music videos. ECF No. 110 at 4.

Thus, based upon the Defendant's involvement in the Rodriguez-Cumba Drug-Trafficking organization, the nature and the circumstances of the charged offenses justify detaining the Defendant as a danger to the community.

b.  <u>The Weight of the Evidence</u>

The weight of the evidence against the Defendant overwhelmingly supports detention. The charges in the Indictment will be proven with a variety of evidence acquired through in-depth investigations into the Defendant and the Rodriguez-Cumba Drug Trafficking Organization, not only in Puerto Rico but throughout the East Coast of the continental United States.

i.  <u>Physical Evidence</u>

The government will prove its case against The Defendant through physical evidence. The government recovered approximately seventy kilograms of cocaine from a vehicle that the Defendant loaded with bags and subsequently abandoned.  The Defendant's flight from the Honda Pilot—where members of the investigative team recovered seventy kilograms of cocaine—is video recorded, and the Defendant can be identified through his extensive tattoos..  Through the execution of the second search warrant at the Residence where members of the investigative team recovered kilograms of cocaine matching the branding recovered from the Honda Pilot.  The government recovered drug ledgers from the search warrant, which detail the financial agreements between members of the Rodriguez-Cumba Drug Trafficking organization, including the Defendant who is listed under his alias "Dogi", and others. There will also be evidence produced through extensive physical surveillance on the date where the Defendant fled from the Honda Pilot.  All told, the violations set forth in the Indictment incorporate 100 kilograms of seized cocaine.

ii.  <u>Court-Authorized Searches of Electronic Devices</u>

The Defendant's guilt will also be established through court-authorized searches of electronic devices.   For example, law enforcement has identified WhatsApp text, video, and

audio communications between a WhatsApp Account listed as "Jose Rodriguez-Cumba" and a WhatsApp account "Doggi Bueno" associated with "13474303418" and a picture of the Defendant. In those communications, despite offering no assets, there are photographs of currency counters. There is a video of currency in the number in the tens of thousands of dollars. There are photographs of packages and associated shipping information that is consistent with the modus operandi of the Rodriguez-Cumba Drug Trafficking Organization. There are photographs of flight information to New York, where the Defendant oversaw the receipt side of the Rodriguez-Cumba Drug Trafficking Organization. There are additionally, seven phone calls between the Defendant and Rodriguez-Cumba on September 10, 2021, after Rodriguez-Cumba was stopped and before the seizure of seventy kilograms of cocaine from the Honda pilot.

The weight of the evidence substantiates the Defendant's role as a high-ranking and trusted member of the violent Rodriguez-Cumba Drug Trafficking Organization.

    c. <u>The History and Characteristics of the Defendant</u>
          i. <u>The Defendant's Lack of Employment and Music Videos</u>

The Defendant has no listed employment for the past year and stated that he is a music producer and singer. ECF No. 110 at 3. The Defendant has posted a series of music videos on youtube.com where the Defendant's music videos consistently display the Defendant possessing various firearms, scenes depicting robberies, carjackings, and murders.[13]

The Defendant's music videos would not only go to the Defendant's character, but parts would be admissible at trial against the Defendant. The First Amendment does not, "prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or

---

[13] https://www.youtube.com/user/eldoggyman79 (retrieved May 2, 2022)

intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993). "Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like." *Id.* "Rap lyrics and tattoos are properly admitted, however, where they are relevant, and their probative value is not substantially outweighed by the danger of unfair prejudice." *See United States v. Moore,* 639 F.3d 443, 447–448 (8th Cir.2011) (affirming admission of profane and violent rap recordings over Fed.R.Evid. 403 challenge where lyrics were probative of defendant's participation in narcotics conspiracy); *United States v. Belfast, 611 F.3d 783, 820 (11th Cir.2010)* (holding that rap lyrics were relevant and their probative value not substantially outweighed by any unfair prejudice in case where lyrics were used to show that defendant was associated with his father Charles Taylor's Anti–Terrorism Unit, which tortured Sierra Leoneans in Liberia). *See United States v. Pierce*, 785 F. 3d 832, 840-841 (2nd Cir. 2015).

In a music video titled "REZO" the Defendant can be observed with three distinct pistols, including one with an extended magazine. Throughout the music video the Defendant is on a chair displaying multiple firearms for the camera, surrounded by masked individuals carrying automatic and semi-automatic weapons. The video subplot depicts multiple masked individuals gathering in a vehicle, preparing to carjack a vehicle, eventually carrying out the carjacking and in the process of executing the carjacking a masked individuals shoots the driver.

Throughout the music video the Defendant alludes to firearms—at one point he states, "Rifles sound like batteries in a Skrillex track. I'll put some inside of you while chilling and then do my time like meek milly. You guys don't know the meaning of *power*. And if you guys confront me, we'll be here waiting for you 24 hours." The Defendant states that he would

shoot someone and do his prison time like Philadelphia area rapper Meek Mill who was sentenced to years in prison and a lengthy probation after being convicted of gun possession.[14] Later the Defendant raps, "The Eddie Bauer, the rods and the sig Sauer.  I'll explode you like a baby shower balloon."  *Id.* A Sig Sauer is a brand of a firearm, and the Defendant's reference to a ballon is a reference to shooting someone.   The Defendant plainly states, "That's why I don't even go to my mailbox without my gun."  *Id.*  Additionally, the Defendant suggests, "May god forgive me, but I am not going down because of a son of a bitch"

The Defendant also alludes to importation of cocaine stating, "Boats arrive through the coast."  This is a common method of drug trafficking in the District of Puerto Rico, as small vessels will arrive on the shoreline and transport hundreds of kilograms at a time.

In another public music video, titled "La Pistola" the Defendant is carrying what appears to be a gold-plated semi-automatic pistol. The plot of the music video depicts a masked individual with a revolver chasing down another individual and shooting him.[15]  In another music video titled "Confia" the Defendant is seen holding another pistol.[16]

Not only do the Defendant's music videos prove his familiarity with firearms, his membership in the narcotics conspiracy, pay tribute to deceased associates, but they glorify carjacking—a danger to the community that has plagued the District of Puerto Rico.[17]

---

[14] https://www.rollingstone.com/music/music-news/meek-mills-legal-troubles-a-history-117981/ (retrieved May 2, 2022)
[15] https://www.youtube.com/watch?v=8qR607L-7Uo (retrieved May 2, 2022)
[16] https://www.youtube.com/watch?v=WxiNuI8f9Ec (retrieved May 2, 2022)
[17] https://www.justice.gov/usao-pr/pr/carjacking-prevention-campaign (Retrieved April 26, 2022)

Additionally, the last video posted to the ElDoggyTv account was posted on September 5, 2021, a mere five days before the Defendant abandoned the Honda Pilot with approximately seventy kilograms of cocaine.

### ii.   The Defendant's Drug Use and Criminal History

Not only is the Defendant unemployed but the Defendant smokes fifteen marijuana cigarettes a day and has a history of substance abuse where he took twenty-five pills a day of Percocet which contains oxycodone.  ECF No. 110 at 3.  The Defendant was also arrested and charged with Article 401 of the PR Controlled Substances law in 2015.  *Id* at 4.

### iii.   The Defendant's Concealment of Assets

The Defendant did not report any assets, liabilities, income or expenses to probation. ECF No. 110 at 3.  The Defendant was not forthcoming with probation about the assets that he has received from his involvement in the Rodriguez-Cumba drug trafficking organization. The Defendant's failure to report these assets demonstrate the Defendants willingness to conceal his assets even after having been arrested.

### d.   The Nature and Seriousness of the Danger Posed by Release

As detailed above, the Defendant's release poses a danger to the community.  Once he is no longer burdened by his flight from the Indictment, the Defendant will be able to assist Rodriguez-Cumba in continuing the drug trafficking organization while Rodriguez-Cumba remains detained pending trial.  On April 21, 2022, a grand jury sitting in the District of Puerto Rico returned a one count indictment—22-cr-173—charging Rodriguez-Cumba with Possessing Contraband in Prison.  The contraband associated with the one count is a cellular telephone that Rodriguez-Cumba had while detained at MDC—Guaynabo.

Detaining the Defendant pending trial will dramatically reduce the risk that he will continue his work on the "streets." For those reasons, no conditions or combination of conditions can assure the safety of the community.

3. [8] WILLIAM J. PANTOJA-NIEVES,
   a. The Nature and Circumstances of the Offenses Charged

As detailed above, the Defendant's is a high-level member in an organization responsible for hundreds of kilograms of cocaine which causes thousands of deaths each year.[18] The Defendant helps oversee a cocaine distribution infrastructure in Puerto Rico that brings cocaine to Florida, New York, and Connecticut and obtains multi-millions in cash profits. The seventy kilograms of cocaine recovered just from the Honda pilot have a value in Puerto Rico of over 1.2 million dollars.

As in *Columbo* and *Patriarca*, the Defendant's position as a high-ranking member within the Rodriguez-Cumba Drug Trafficking Organization warrants detention. *See United States v. Colombo*, 777 F.2d 96, 99 (2nd Cir. 1985); *United States v. Patriarca*, 948 F 2d 789, 795 (1st Cir. 1991). The organization is responsible for multiple murders and this organization poses a "risk to the public" and a "danger to the community" by its "consistent pattern of orchestrating a series of violent criminal operations." *Id.* at 99. When it became apparent that members of law enforcement were surveilling him on September 10, 2021, Rodriguez-Cumba called the Defendant and entrusted him to remove kilograms of cocaine worth over a million dollars from Rodriguez-Cumba's residence. The Defendant was also responsible for overseeing activities of the organization in New York and Connecticut. This is demonstrated

---

[18] https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates (retrieved September 23, 2023) ("2019 to 2021, cocaine-involved deaths rose nearly 54% to 24,486 death")

by the residences that appear in the Pretrial Services Report in both Connecticut and the Bronx. ECF No 110 at 2.

Additionally, multiple firearms have been recovered from the Rodriguez-Cumba Drug Trafficking organization including a modified machine-gun. The Defendant does not have a weapons permit that would justify possession of any of these weapons or the weapons he displays in his music videos. ECF No. 110 at 4.

Thus, based upon the Defendant's involvement in the Rodriguez-Cumba Drug-Trafficking organization, the nature and the circumstances of the charged offenses justify detaining the Defendant as a danger to the community.

b. The Weight of the Evidence

The weight of the evidence against the Defendant overwhelmingly supports detention. The charges in the Indictment will be proven with a variety of evidence acquired through in-depth investigations into the Defendant and the Rodriguez-Cumba Drug Trafficking Organization, not only in Puerto Rico but throughout the East Coast of the continental United States.

i. Physical Evidence

The government will prove its case against The Defendant through physical evidence. The government recovered approximately seventy kilograms of cocaine from a vehicle that the Defendant loaded with bags and subsequently abandoned. The Defendant's flight from the Honda Pilot—where members of the investigative team recovered seventy kilograms of cocaine—is video recorded, and the Defendant can be identified through his extensive tattoos. Through the execution of the second search warrant at the Residence where members of the investigative team recovered kilograms of cocaine matching the branding recovered from the

Honda Pilot. The government recovered drug ledgers from the search warrant, which detail the financial agreements between members of the Rodriguez-Cumba Drug Trafficking organization, including the Defendant who is listed under his alias "Dogi", and others. There will also be evidence produced through extensive physical surveillance on the date where the Defendant fled from the Honda Pilot. All told, the violations set forth in the Indictment incorporate 100 kilograms of seized cocaine.

### ii. Court-Authorized Searches of Electronic Devices

The Defendant's guilt will also be established through court-authorized searches of electronic devices. For example, law enforcement has identified WhatsApp text, video, and audio communications between a WhatsApp Account listed as "Jose Rodriguez-Cumba" and a WhatsApp account "Doggi Bueno" associated with "13474303418" and a picture of the Defendant. In those communications, despite offering no assets, there are photographs of currency counters. There is a video of currency in the number in the tens of thousands of dollars. There are photographs of packages and associated shipping information that is consistent with the modus operandi of the Rodriguez-Cumba Drug Trafficking Organization. There are photographs of flight information to New York, where the Defendant oversaw the receipt side of the Rodriguez-Cumba Drug Trafficking Organization. There are additionally, seven phone calls between the Defendant and Rodriguez-Cumba on September 10, 2021, after Rodriguez-Cumba was stopped and before the seizure of seventy kilograms of cocaine from the Honda pilot.

The weight of the evidence substantiates the Defendant's role as a high-ranking and trusted member of the violent Rodriguez-Cumba Drug Trafficking Organization.

### c. The History and Characteristics of the Defendant

### i. The Defendant's Lack of Employment and Music Videos

The Defendant has no listed employment for the past year and stated that he is a music producer and singer. ECF No. 110 at 3. The Defendant has posted a series of music videos on youtube.com where the Defendant's music videos consistently display the Defendant possessing various firearms, scenes depicting robberies, carjackings, and murders.[19]

The Defendant's music videos would not only go to the Defendant's character, but parts would be admissible at trial against the Defendant. The First Amendment does not, "prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993). "Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like." *Id.* "Rap lyrics and tattoos are properly admitted, however, where they are relevant, and their probative value is not substantially outweighed by the danger of unfair prejudice." *See United States v. Moore,* 639 F.3d 443, 447–448 (8th Cir.2011) (affirming admission of profane and violent rap recordings over Fed.R.Evid. 403 challenge where lyrics were probative of defendant's participation in narcotics conspiracy); *United States v. Belfast, 611 F.3d 783, 820 (11th Cir.2010)* (holding that rap lyrics were relevant and their probative value not substantially outweighed by any unfair prejudice in case where lyrics were used to show that defendant was associated with his father Charles Taylor's Anti–Terrorism Unit, which tortured Sierra Leoneans in Liberia). *See United States v. Pierce*, 785 F. 3d 832, 840-841 (2nd Cir. 2015).

In a music video titled "REZO" the Defendant can be observed with three distinct pistols, including one with an extended magazine. Throughout the music video the Defendant is on

[19] https://www.youtube.com/user/eldoggyman79 (retrieved May 2, 2022)

a chair displaying multiple firearms for the camera, surrounded by masked individuals carrying automatic and semi-automatic weapons. The video subplot depicts multiple masked individuals gathering in a vehicle, preparing to carjack a vehicle, eventually carrying out the carjacking and in the process of executing the carjacking a masked individuals shoots the driver.

Throughout the music video the Defendant alludes to firearms—at one point he states, "Rifles sound like batteries in a Skrillex track. I'll put some inside of you while chilling and then do my time like meek milly. You guys don't know the meaning of *power*. And if you guys confront me, we'll be here waiting for you 24 hours." The Defendant states that he would shoot someone and do his prison time like Philadelphia area rapper Meek Mill who was sentenced to years in prison and a lengthy probation after being convicted of gun possession.[20] Later the Defendant raps, "The Eddie Bauer, the rods and the sig Sauer. I'll explode you like a baby shower balloon." *Id.* A Sig Sauer is a brand of a firearm, and the Defendant's reference to a ballon is a reference to shooting someone. The Defendant plainly states, "That's why I don't even go to my mailbox without my gun." *Id.* Additionally, the Defendant suggests, "May god forgive me, but I am not going down because of a son of a bitch."

The Defendant also alludes to importation of cocaine stating, "Boats arrive through the coast." This is a common method of drug trafficking in the District of Puerto Rico, as small vessels will arrive on the shoreline and transport hundreds of kilograms at a time.

---

[20] https://www.rollingstone.com/music/music-news/meek-mills-legal-troubles-a-history-117981/ (retrieved May 2, 2022)

In another public music video, titled "La Pistola" the Defendant is carrying what appears to be a gold-plated semi-automatic pistol. The plot of the music video depicts a masked individual with a revolver chasing down another individual and shooting him.[21] In another music video titled "Confia" the Defendant is seen holding another pistol.[22]

Not only do the Defendant's music videos prove his familiarity with firearms, his membership in the narcotics conspiracy, pay tribute to deceased associates, but they glorify carjacking—a danger to the community that has plagued the District of Puerto Rico.[23]

Additionally, the last video posted to the ElDoggyTv account was posted on September 5, 2021, a mere five days before the Defendant abandoned the Honda Pilot with approximately seventy kilograms of cocaine.

ii. <u>The Defendant's Drug Use and Criminal History</u>

Not only is the Defendant unemployed but the Defendant smokes fifteen marijuana cigarettes a day and has a history of substance abuse where he took twenty-five pills a day of Percocet which contains oxycodone. ECF No. 110 at 3. The Defendant was also arrested and charged with Article 401 of the PR Controlled Substances law in 2015. *Id* at 4.

iii. <u>The Defendant's Concealment of Assets</u>

The Defendant did not report any assets, liabilities, income or expenses to probation. ECF No. 110 at 3. The Defendant was not forthcoming with probation about the assets that he has received from his involvement in the Rodriguez-Cumba drug trafficking organization.

---

[21] https://www.youtube.com/watch?v=8qR607L-7Uo (retrieved May 2, 2022)
[22] https://www.youtube.com/watch?v=WxiNul8f9Ec (retrieved May 2, 2022)
[23] https://www.justice.gov/usao-pr/pr/carjacking-prevention-campaign (Retrieved April 26, 2022)

The Defendant's failure to report these assets demonstrate the Defendants willingness to conceal his assets even after having been arrested.

### d. The Nature and Seriousness of the Danger Posed by Release

As detailed above, the Defendant's release poses a danger to the community. Once he is no longer burdened by his flight from the Indictment, the Defendant will be able to assist Rodriguez-Cumba in continuing the drug trafficking organization while Rodriguez-Cumba remains detained pending trial. On April 21, 2022, a grand jury sitting in the District of Puerto Rico returned a one count indictment—22-cr-173—charging Rodriguez-Cumba with Possessing Contraband in Prison. The contraband associated with the one count is a cellular telephone that Rodriguez-Cumba had while detained at MDC—Guaynabo.

Detaining the Defendant pending trial will dramatically reduce the risk that he will continue his work on the "streets." For those reasons, no conditions or combination of conditions can assure the safety of the community.

### 4. [9] LUIS J. HERNANDEZ-CRUZ,

### a. The Nature and Circumstances of the Offenses Charged

As detailed above, the Defendant's is a high-level member in an organization responsible for hundreds of kilograms of cocaine which causes thousands of deaths each year.[24] The Defendant helps oversee a cocaine distribution infrastructure in Puerto Rico that brings cocaine to Florida, New York, and Connecticut and obtains multi-millions in cash profits. The seventy kilograms of cocaine recovered just from the Honda pilot have a value in Puerto Rico of over 1.2 million dollars.

---

[24] https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates (retrieved September 23, 2023)("2019 to 2021, cocaine-involved deaths rose nearly 54% to 24,486 death")

As in *Columbo* and *Patriarca*, the Defendant's position as a high-ranking member within the Rodriguez-Cumba Drug Trafficking Organization warrants detention. *See United States v. Colombo*, 777 F.2d 96, 99 (2nd Cir. 1985); *United States v. Patriarca*, 948 F 2d 789, 795 (1st Cir. 1991). The organization is responsible for multiple murders and this organization poses a "risk to the public" and a "danger to the community" by its "consistent pattern of orchestrating a series of violent criminal operations." *Id.* at 99. When it became apparent that members of law enforcement were surveilling him on September 10, 2021, Rodriguez-Cumba called the Defendant and entrusted him to remove kilograms of cocaine worth over a million dollars from Rodriguez-Cumba's residence. The Defendant was also responsible for overseeing activities of the organization in New York and Connecticut. This is demonstrated by the residences that appear in the Pretrial Services Report in both Connecticut and the Bronx. ECF No 110 at 2.

Additionally, multiple firearms have been recovered from the Rodriguez-Cumba Drug Trafficking organization including a modified machine-gun. The Defendant does not have a weapons permit that would justify possession of any of these weapons or the weapons he displays in his music videos. ECF No. 110 at 4.

Thus, based upon the Defendant's involvement in the Rodriguez-Cumba Drug-Trafficking organization, the nature and the circumstances of the charged offenses justify detaining the Defendant as a danger to the community.

### b. The Weight of the Evidence

The weight of the evidence against the Defendant overwhelmingly supports detention. The charges in the Indictment will be proven with a variety of evidence acquired through in-depth investigations into the Defendant and the Rodriguez-Cumba Drug Trafficking

Organization, not only in Puerto Rico but throughout the East Coast of the continental United States.

i. <u>Physical Evidence</u>

The government will prove its case against The Defendant through physical evidence. The government recovered approximately seventy kilograms of cocaine from a vehicle that the Defendant loaded with bags and subsequently abandoned. The Defendant's flight from the Honda Pilot—where members of the investigative team recovered seventy kilograms of cocaine—is video recorded, and the Defendant can be identified through his extensive tattoos. Through the execution of the second search warrant at the Residence where members of the investigative team recovered kilograms of cocaine matching the branding recovered from the Honda Pilot. The government recovered drug ledgers from the search warrant, which detail the financial agreements between members of the Rodriguez-Cumba Drug Trafficking organization, including the Defendant who is listed under his alias "Dogi", and others. There will also be evidence produced through extensive physical surveillance on the date where the Defendant fled from the Honda Pilot. All told, the violations set forth in the Indictment incorporate 100 kilograms of seized cocaine.

ii. <u>Court-Authorized Searches of Electronic Devices</u>

The Defendant's guilt will also be established through court-authorized searches of electronic devices. For example, law enforcement has identified WhatsApp text, video, and audio communications between a WhatsApp Account listed as "Jose Rodriguez-Cumba" and a WhatsApp account "Doggi Bueno" associated with "13474303418" and a picture of the Defendant. In those communications, despite offering no assets, there are photographs of currency counters. There is a video of currency in the number in the tens of thousands of

dollars. There are photographs of packages and associated shipping information that is consistent with the modus operandi of the Rodriguez-Cumba Drug Trafficking Organization. There are photographs of flight information to New York, where the Defendant oversaw the receipt side of the Rodriguez-Cumba Drug Trafficking Organization. There are additionally, seven phone calls between the Defendant and Rodriguez-Cumba on September 10, 2021, after Rodriguez-Cumba was stopped and before the seizure of seventy kilograms of cocaine from the Honda pilot.

The weight of the evidence substantiates the Defendant's role as a high-ranking and trusted member of the violent Rodriguez-Cumba Drug Trafficking Organization.

### c. The History and Characteristics of the Defendant
#### i. The Defendant's Lack of Employment and Music Videos

The Defendant has no listed employment for the past year and stated that he is a music producer and singer. ECF No. 110 at 3. The Defendant has posted a series of music videos on youtube.com where the Defendant's music videos consistently display the Defendant possessing various firearms, scenes depicting robberies, carjackings, and murders.[25]

The Defendant's music videos would not only go to the Defendant's character, but parts would be admissible at trial against the Defendant. The First Amendment does not, "prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993). "Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like." *Id.* "Rap lyrics and tattoos are properly admitted, however, where they are relevant, and their probative value is not substantially

---
[25] https://www.youtube.com/user/eldoggyman79 (retrieved May 2, 2022)

outweighed by the danger of unfair prejudice." *See United States v. Moore,* 639 F.3d 443, 447–448 (8th Cir.2011) (affirming admission of profane and violent rap recordings over Fed.R.Evid. 403 challenge where lyrics were probative of defendant's participation in narcotics conspiracy); *United States v. Belfast, 611 F.3d 783, 820 (11th Cir.2010)* (holding that rap lyrics were relevant and their probative value not substantially outweighed by any unfair prejudice in case where lyrics were used to show that defendant was associated with his father Charles Taylor's Anti–Terrorism Unit, which tortured Sierra Leoneans in Liberia). *See United States v. Pierce*, 785 F. 3d 832, 840-841 (2nd Cir. 2015).

In a music video titled "REZO" the Defendant can be observed with three distinct pistols, including one with an extended magazine. 4; 5; 6; 7. Throughout the music video the Defendant is on a chair displaying multiple firearms for the camera, surrounded by masked individuals carrying automatic and semi-automatic weapons. The video subplot depicts multiple masked individuals gathering in a vehicle, preparing to carjack a vehicle, eventually carrying out the carjacking and in the process of executing the carjacking a masked individuals shoots the driver. 8.

Throughout the music video the Defendant alludes to firearms—at one point he states, "Rifles sound like batteries in a Skrillex track. I'll put some inside of you while chilling and then do my time like meek milly. You guys don't know the meaning of *power*. And if you guys confront me, we'll be here waiting for you 24 hours." 5. The Defendant states that he would shoot someone and do his prison time like Philadelphia area rapper Meek Mill who was sentenced to years in prison and a lengthy probation after being convicted of gun

possession.[26]   Later the Defendant raps, "The Eddie Bauer, the rods and the sig Sauer.  I'll explode you like a baby shower balloon."  *Id.* A Sig Sauer is a brand of a firearm, and the Defendant's reference to a ballon is a reference to shooting someone.   The Defendant plainly states, "That's why I don't even go to my mailbox without my gun." *Id.*  Additionally, the Defendant suggests, "May god forgive me, but I am not going down because of a son of a bitch"

The Defendant also alludes to importation of cocaine stating, "Boats arrive through the coast."  5. This is a common method of drug trafficking in the District of Puerto Rico, as small vessels will arrive on the shoreline and transport hundreds of kilograms at a time.

In another public music video, titled "La Pistola" the Defendant is carrying what appears to be a gold-plated semi-automatic pistol. 9; 0.  The plot of the music video depicts a masked individual with a revolver chasing down another individual and shooting him.[27]  In another music video titled "Confia" the Defendant is seen holding another pistol.[28]  1; 2.

Not only do the Defendant's music videos prove his familiarity with firearms, his membership in the narcotics conspiracy, pay tribute to deceased associates, but they glorify carjacking—a danger to the community that has plagued the District of Puerto Rico.[29]

Additionally, the last video posted to the ElDoggyTv account was posted on September 5, 2021, a mere five days before the Defendant abandoned the Honda Pilot with approximately seventy kilograms of cocaine.

---

[26] https://www.rollingstone.com/music/music-news/meek-mills-legal-troubles-a-history-117981/ (retrieved May 2, 2022)
[27] https://www.youtube.com/watch?v=8qR607L-7Uo (retrieved May 2, 2022)
[28] https://www.youtube.com/watch?v=WxiNul8f9Ec (retrieved May 2, 2022)
[29] https://www.justice.gov/usao-pr/pr/carjacking-prevention-campaign (Retrieved April 26, 2022)

### ii. The Defendant's Drug Use and Criminal History

Not only is the Defendant unemployed but the Defendant smokes fifteen marijuana cigarettes a day and has a history of substance abuse where he took twenty-five pills a day of Percocet which contains oxycodone. ECF No. 110 at 3. The Defendant was also arrested and charged with Article 401 of the PR Controlled Substances law in 2015. *Id* at 4.

### iii. The Defendant's Concealment of Assets

The Defendant did not report any assets, liabilities, income or expenses to probation. ECF No. 110 at 3. The Defendant was not forthcoming with probation about the assets that he has received from his involvement in the Rodriguez-Cumba drug trafficking organization. *See* ; 1. The Defendant's failure to report these assets demonstrate the Defendants willingness to conceal his assets even after having been arrested.

### d. The Nature and Seriousness of the Danger Posed by Release

As detailed above, the Defendant's release poses a danger to the community. Once he is no longer burdened by his flight from the Indictment, the Defendant will be able to assist Rodriguez-Cumba in continuing the drug trafficking organization while Rodriguez-Cumba remains detained pending trial. On April 21, 2022, a grand jury sitting in the District of Puerto Rico returned a one count indictment—22-cr-173—charging Rodriguez-Cumba with Possessing Contraband in Prison. The contraband associated with the one count is a cellular telephone that Rodriguez-Cumba had while detained at MDC—Guaynabo.

Detaining the Defendant pending trial will dramatically reduce the risk that he will continue his work on the "streets." For those reasons, no conditions or combination of conditions can assure the safety of the community.

5. [10] EDWIN DANIEL GONZALEZ-REYES,

a. The Nature and Circumstances of the Offenses Charged

As detailed above, the Defendant's is a high-level member in an organization responsible for hundreds of kilograms of cocaine which causes thousands of deaths each year.[30] The Defendant helps oversee a cocaine distribution infrastructure in Puerto Rico that brings cocaine to Florida, New York, and Connecticut and obtains multi-millions in cash profits. The seventy kilograms of cocaine recovered just from the Honda pilot have a value in Puerto Rico of over 1.2 million dollars.

As in *Columbo* and *Patriarca*, the Defendant's position as a high-ranking member within the Rodriguez-Cumba Drug Trafficking Organization warrants detention. *See United States v. Colombo*, 777 F.2d 96, 99 (2nd Cir. 1985); *United States v. Patriarca*, 948 F 2d 789, 795 (1st Cir. 1991). The organization is responsible for multiple murders and this organization poses a "risk to the public" and a "danger to the community" by its "consistent pattern of orchestrating a series of violent criminal operations." *Id.* at 99. When it became apparent that members of law enforcement were surveilling him on September 10, 2021, Rodriguez-Cumba called the Defendant and entrusted him to remove kilograms of cocaine worth over a million dollars from Rodriguez-Cumba's residence. The Defendant was also responsible for overseeing activities of the organization in New York and Connecticut. This is demonstrated by the residences that appear in the Pretrial Services Report in both Connecticut and the Bronx. ECF No 110 at 2.

Additionally, multiple firearms have been recovered from the Rodriguez-Cumba Drug Trafficking organization including a modified machine-gun. The Defendant does not have a

---

[30] https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates (retrieved September 23, 2023)("2019 to 2021, cocaine-involved deaths rose nearly 54% to 24,486 death")

weapons permit that would justify possession of any of these weapons or the weapons he displays in his music videos. ECF No. 110 at 4.

Thus, based upon the Defendant's involvement in the Rodriguez-Cumba Drug-Trafficking organization, the nature and the circumstances of the charged offenses justify detaining the Defendant as a danger to the community.

### b. The Weight of the Evidence

The weight of the evidence against the Defendant overwhelmingly supports detention. The charges in the Indictment will be proven with a variety of evidence acquired through in-depth investigations into the Defendant and the Rodriguez-Cumba Drug Trafficking Organization, not only in Puerto Rico but throughout the East Coast of the continental United States.

### i. Physical Evidence

The government will prove its case against The Defendant through physical evidence. The government recovered approximately seventy kilograms of cocaine from a vehicle that the Defendant loaded with bags and subsequently abandoned. The Defendant's flight from the Honda Pilot—where members of the investigative team recovered seventy kilograms of cocaine—is video recorded, and the Defendant can be identified through his extensive tattoos. *See* . Through the execution of the second search warrant at the Residence where members of the investigative team recovered kilograms of cocaine matching the branding recovered from the Honda Pilot. ; . The government recovered drug ledgers from the search warrant, which detail the financial agreements between members of the Rodriguez-Cumba Drug Trafficking organization, including the Defendant who is listed under his alias "Dogi", and others. . There will also be evidence produced through extensive physical surveillance on the

date where the Defendant fled from the Honda Pilot. All told, the violations set forth in the Indictment incorporate 100 kilograms of seized cocaine.

ii. Court-Authorized Searches of Electronic Devices

The Defendant's guilt will also be established through court-authorized searches of electronic devices. For example, law enforcement has identified WhatsApp text, video, and audio communications between a WhatsApp Account listed as "Jose Rodriguez-Cumba" and a WhatsApp account "Doggi Bueno" associated with "13474303418" and a picture of the Defendant. In those communications, despite offering no assets, there are photographs of currency counters. 0. There is a video of currency in the number in the tens of thousands of dollars. 1. There are photographs of packages and associated shipping information that is consistent with the modus operandi of the Rodriguez-Cumba Drug Trafficking Organization. 2. There are photographs of flight information to New York, where the Defendant oversaw the receipt side of the Rodriguez-Cumba Drug Trafficking Organization. There are additionally, seven phone calls between the Defendant and Rodriguez-Cumba on September 10, 2021, after Rodriguez-Cumba was stopped and before the seizure of seventy kilograms of cocaine from the Honda pilot.

The weight of the evidence substantiates the Defendant's role as a high-ranking and trusted member of the violent Rodriguez-Cumba Drug Trafficking Organization.

c. The History and Characteristics of the Defendant
i. The Defendant's Lack of Employment and Music Videos

The Defendant has no listed employment for the past year and stated that he is a music producer and singer. ECF No. 110 at 3. The Defendant has posted a series of music videos

on youtube.com where the Defendant's music videos consistently display the Defendant possessing various firearms, scenes depicting robberies, carjackings, and murders.[31]

The Defendant's music videos would not only go to the Defendant's character, but parts would be admissible at trial against the Defendant. The First Amendment does not, "prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993). "Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like." *Id.* "Rap lyrics and tattoos are properly admitted, however, where they are relevant, and their probative value is not substantially outweighed by the danger of unfair prejudice." *See United States v. Moore,* 639 F.3d 443, 447–448 (8th Cir.2011) (affirming admission of profane and violent rap recordings over Fed.R.Evid. 403 challenge where lyrics were probative of defendant's participation in narcotics conspiracy); *United States v. Belfast, 611 F.3d 783, 820 (11th Cir.2010)* (holding that rap lyrics were relevant and their probative value not substantially outweighed by any unfair prejudice in case where lyrics were used to show that defendant was associated with his father Charles Taylor's Anti–Terrorism Unit, which tortured Sierra Leoneans in Liberia). *See United States v. Pierce*, 785 F. 3d 832, 840-841 (2nd Cir. 2015).

In a music video titled "REZO" the Defendant can be observed with three distinct pistols, including one with an extended magazine. 4; 5; 6; 7. Throughout the music video the Defendant is on a chair displaying multiple firearms for the camera, surrounded by masked individuals carrying automatic and semi-automatic weapons. The video subplot depicts

---

[31] https://www.youtube.com/user/eldoggyman79 (retrieved May 2, 2022)

multiple masked individuals gathering in a vehicle, preparing to carjack a vehicle, eventually carrying out the carjacking and in the process of executing the carjacking a masked individuals shoots the driver.  8.

Throughout the music video the Defendant alludes to firearms—at one point he states, "Rifles sound like batteries in a Skrillex track.  I'll put some inside of you while chilling and then do my time like meek milly.  You guys don't know the meaning of *power*.  And if you guys confront me, we'll be here waiting for you 24 hours."  5.  The Defendant states that he would shoot someone and do his prison time like Philadelphia area rapper Meek Mill who was sentenced to years in prison and a lengthy probation after being convicted of gun possession.[32]   Later the Defendant raps, "The Eddie Bauer, the rods and the sig Sauer.  I'll explode you like a baby shower balloon."  *Id.*  A Sig Sauer is a brand of a firearm, and the Defendant's reference to a ballon is a reference to shooting someone.   The Defendant plainly states, "That's why I don't even go to my mailbox without my gun."  *Id.*  Additionally, the Defendant suggests, "May god forgive me, but I am not going down because of a son of a bitch"

The Defendant also alludes to importation of cocaine stating, "Boats arrive through the coast."  5. This is a common method of drug trafficking in the District of Puerto Rico, as small vessels will arrive on the shoreline and transport hundreds of kilograms at a time.

In another public music video, titled "La Pistola" the Defendant is carrying what appears to be a gold-plated semi-automatic pistol. 9; 0.  The plot of the music video depicts a masked

---

[32] https://www.rollingstone.com/music/music-news/meek-mills-legal-troubles-a-history-117981/ (retrieved May 2, 2022)

individual with a revolver chasing down another individual and shooting him.[33]  In another music video titled "Confia" the Defendant is seen holding another pistol.[34]  1; 2.

Not only do the Defendant's music videos prove his familiarity with firearms, his membership in the narcotics conspiracy, pay tribute to deceased associates, but they glorify carjacking—a danger to the community that has plagued the District of Puerto Rico.[35]

Additionally, the last video posted to the ElDoggyTv account was posted on September 5, 2021, a mere five days before the Defendant abandoned the Honda Pilot with approximately seventy kilograms of cocaine.

### ii.  The Defendant's Drug Use and Criminal History

Not only is the Defendant unemployed but the Defendant smokes fifteen marijuana cigarettes a day and has a history of substance abuse where he took twenty-five pills a day of Percocet which contains oxycodone.  ECF No. 110 at 3.  The Defendant was also arrested and charged with Article 401 of the PR Controlled Substances law in 2015.  *Id* at 4.

### iii.  The Defendant's Concealment of Assets

The Defendant did not report any assets, liabilities, income or expenses to probation. ECF No. 110 at 3.  The Defendant was not forthcoming with probation about the assets that he has received from his involvement in the Rodriguez-Cumba drug trafficking organization. *See* ; 1.  The Defendant's failure to report these assets demonstrate the Defendants willingness to conceal his assets even after having been arrested.

---

[33] https://www.youtube.com/watch?v=8qR607L-7Uo (retrieved May 2, 2022)
[34] https://www.youtube.com/watch?v=WxiNul8f9Ec (retrieved May 2, 2022)
[35] https://www.justice.gov/usao-pr/pr/carjacking-prevention-campaign (Retrieved April 26, 2022)

      d.  <u>The Nature and Seriousness of the Danger Posed by Release</u>

As detailed above, the Defendant's release poses a danger to the community. Once he is no longer burdened by his flight from the Indictment, the Defendant will be able to assist Rodriguez-Cumba in continuing the drug trafficking organization while Rodriguez-Cumba remains detained pending trial. On April 21, 2022, a grand jury sitting in the District of Puerto Rico returned a one count indictment—22-cr-173—charging Rodriguez-Cumba with Possessing Contraband in Prison. The contraband associated with the one count is a cellular telephone that Rodriguez-Cumba had while detained at MDC—Guaynabo.

Detaining the Defendant pending trial will dramatically reduce the risk that he will continue his work on the "streets." For those reasons, no conditions or combination of conditions can assure the safety of the community.

   6.  [11] FERNANDO CORTES-FLORES
      a.  <u>The Nature and Circumstances of the Offenses Charged</u>

As detailed above, the Defendant's is a high-level member in an organization responsible for hundreds of kilograms of cocaine which causes thousands of deaths each year.[36] The Defendant helps oversee a cocaine distribution infrastructure in Puerto Rico that brings cocaine to Florida, New York, and Connecticut and obtains multi-millions in cash profits. The seventy kilograms of cocaine recovered just from the Honda pilot have a value in Puerto Rico of over 1.2 million dollars.

---

[36] https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates (retrieved September 23, 2023)("2019 to 2021, cocaine-involved deaths rose nearly 54% to 24,486 death")

As in *Columbo* and *Patriarca*, the Defendant's position as a high-ranking member within the Rodriguez-Cumba Drug Trafficking Organization warrants detention. *See United States v. Colombo*, 777 F.2d 96, 99 (2nd Cir. 1985); *United States v. Patriarca*, 948 F 2d 789, 795 (1st Cir. 1991). The organization is responsible for multiple murders and this organization poses a "risk to the public" and a "danger to the community" by its "consistent pattern of orchestrating a series of violent criminal operations." *Id.* at 99. When it became apparent that members of law enforcement were surveilling him on September 10, 2021, Rodriguez-Cumba called the Defendant and entrusted him to remove kilograms of cocaine worth over a million dollars from Rodriguez-Cumba's residence. The Defendant was also responsible for overseeing activities of the organization in New York and Connecticut. This is demonstrated by the residences that appear in the Pretrial Services Report in both Connecticut and the Bronx. ECF No 110 at 2.

Additionally, multiple firearms have been recovered from the Rodriguez-Cumba Drug Trafficking organization including a modified machine-gun. The Defendant does not have a weapons permit that would justify possession of any of these weapons or the weapons he displays in his music videos. ECF No. 110 at 4.

Thus, based upon the Defendant's involvement in the Rodriguez-Cumba Drug-Trafficking organization, the nature and the circumstances of the charged offenses justify detaining the Defendant as a danger to the community.

b. The Weight of the Evidence

The weight of the evidence against the Defendant overwhelmingly supports detention. The charges in the Indictment will be proven with a variety of evidence acquired through in-depth investigations into the Defendant and the Rodriguez-Cumba Drug Trafficking

Organization, not only in Puerto Rico but throughout the East Coast of the continental United States.

### i. Physical Evidence

The government will prove its case against The Defendant through physical evidence. The government recovered approximately seventy kilograms of cocaine from a vehicle that the Defendant loaded with bags and subsequently abandoned. The Defendant's flight from the Honda Pilot—where members of the investigative team recovered seventy kilograms of cocaine—is video recorded, and the Defendant can be identified through his extensive tattoos. *See* . Through the execution of the second search warrant at the Residence where members of the investigative team recovered kilograms of cocaine matching the branding recovered from the Honda Pilot. ; . The government recovered drug ledgers from the search warrant, which detail the financial agreements between members of the Rodriguez-Cumba Drug Trafficking organization, including the Defendant who is listed under his alias "Dogi", and others. . There will also be evidence produced through extensive physical surveillance on the date where the Defendant fled from the Honda Pilot. All told, the violations set forth in the Indictment incorporate 100 kilograms of seized cocaine.

### ii. Court-Authorized Searches of Electronic Devices

The Defendant's guilt will also be established through court-authorized searches of electronic devices. For example, law enforcement has identified WhatsApp text, video, and audio communications between a WhatsApp Account listed as "Jose Rodriguez-Cumba" and a WhatsApp account "Doggi Bueno" associated with "13474303418" and a picture of the Defendant. In those communications, despite offering no assets, there are photographs of currency counters. 0. There is a video of currency in the number in the tens of thousands of

dollars.  1.  There are photographs of packages and associated shipping information that is consistent with the modus operandi of the Rodriguez-Cumba Drug Trafficking Organization.  2.  There are photographs of flight information to New York, where the Defendant oversaw the receipt side of the Rodriguez-Cumba Drug Trafficking Organization.  There are additionally, seven phone calls between the Defendant and Rodriguez-Cumba on September 10, 2021, after Rodriguez-Cumba was stopped and before the seizure of seventy kilograms of cocaine from the Honda pilot.

The weight of the evidence substantiates the Defendant's role as a high-ranking and trusted member of the violent Rodriguez-Cumba Drug Trafficking Organization.

    c.  <u>The History and Characteristics of the Defendant</u>
        i.  <u>The Defendant's Lack of Employment and Music Videos</u>

The Defendant has no listed employment for the past year and stated that he is a music producer and singer.  ECF No. 110 at 3.  The Defendant has posted a series of music videos on youtube.com where the Defendant's music videos consistently display the Defendant possessing various firearms, scenes depicting robberies, carjackings, and murders.[37]

The Defendant's music videos would not only go to the Defendant's character, but parts would be admissible at trial against the Defendant.  The First Amendment does not, "prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent."  *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993).  "Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like." *Id.*    "Rap lyrics and tattoos are properly admitted, however, where they are relevant, and their probative value is not substantially

---

[37] https://www.youtube.com/user/eldoggyman79 (retrieved May 2, 2022)

outweighed by the danger of unfair prejudice." *See United States v. Moore,* 639 F.3d 443, 447–448 (8th Cir.2011) (affirming admission of profane and violent rap recordings over Fed.R.Evid. 403 challenge where lyrics were probative of defendant's participation in narcotics conspiracy); *United States v. Belfast, 611 F.3d 783, 820 (11th Cir.2010)* (holding that rap lyrics were relevant and their probative value not substantially outweighed by any unfair prejudice in case where lyrics were used to show that defendant was associated with his father Charles Taylor's Anti–Terrorism Unit, which tortured Sierra Leoneans in Liberia). *See United States v. Pierce*, 785 F. 3d 832, 840-841 (2nd Cir. 2015).

In a music video titled "REZO" the Defendant can be observed with three distinct pistols, including one with an extended magazine. 4; 5; 6; 7. Throughout the music video the Defendant is on a chair displaying multiple firearms for the camera, surrounded by masked individuals carrying automatic and semi-automatic weapons. The video subplot depicts multiple masked individuals gathering in a vehicle, preparing to carjack a vehicle, eventually carrying out the carjacking and in the process of executing the carjacking a masked individuals shoots the driver. 8.

Throughout the music video the Defendant alludes to firearms—at one point he states, "Rifles sound like batteries in a Skrillex track. I'll put some inside of you while chilling and then do my time like meek milly. You guys don't know the meaning of *power*. And if you guys confront me, we'll be here waiting for you 24 hours." 5. The Defendant states that he would shoot someone and do his prison time like Philadelphia area rapper Meek Mill who was sentenced to years in prison and a lengthy probation after being convicted of gun

possession.[38]  Later the Defendant raps, "The Eddie Bauer, the rods and the sig Sauer.  I'll explode you like a baby shower balloon." *Id.* A Sig Sauer is a brand of a firearm, and the Defendant's reference to a ballon is a reference to shooting someone.   The Defendant plainly states, "That's why I don't even go to my mailbox without my gun." *Id.*  Additionally, the Defendant suggests, "May god forgive me, but I am not going down because of a son of a bitch"

The Defendant also alludes to importation of cocaine stating, "Boats arrive through the coast."  5. This is a common method of drug trafficking in the District of Puerto Rico, as small vessels will arrive on the shoreline and transport hundreds of kilograms at a time.

In another public music video, titled "La Pistola" the Defendant is carrying what appears to be a gold-plated semi-automatic pistol. 9; 0.  The plot of the music video depicts a masked individual with a revolver chasing down another individual and shooting him.[39]  In another music video titled "Confia" the Defendant is seen holding another pistol.[40]  1; 2.

Not only do the Defendant's music videos prove his familiarity with firearms, his membership in the narcotics conspiracy, pay tribute to deceased associates, but they glorify carjacking—a danger to the community that has plagued the District of Puerto Rico.[41]

Additionally, the last video posted to the ElDoggyTv account was posted on September 5, 2021, a mere five days before the Defendant abandoned the Honda Pilot with approximately seventy kilograms of cocaine.

---

[38] https://www.rollingstone.com/music/music-news/meek-mills-legal-troubles-a-history-117981/ (retrieved May 2, 2022)
[39] https://www.youtube.com/watch?v=8qR607L-7Uo (retrieved May 2, 2022)
[40] https://www.youtube.com/watch?v=WxiNuI8f9Ec (retrieved May 2, 2022)
[41] https://www.justice.gov/usao-pr/pr/carjacking-prevention-campaign (Retrieved April 26, 2022)

### ii. The Defendant's Drug Use and Criminal History

Not only is the Defendant unemployed but the Defendant smokes fifteen marijuana cigarettes a day and has a history of substance abuse where he took twenty-five pills a day of Percocet which contains oxycodone.  ECF No. 110 at 3.  The Defendant was also arrested and charged with Article 401 of the PR Controlled Substances law in 2015.  *Id* at 4.

### iii. The Defendant's Concealment of Assets

The Defendant did not report any assets, liabilities, income or expenses to probation. ECF No. 110 at 3.  The Defendant was not forthcoming with probation about the assets that he has received from his involvement in the Rodriguez-Cumba drug trafficking organization. *See* ; 1.  The Defendant's failure to report these assets demonstrate the Defendants willingness to conceal his assets even after having been arrested.

### d. The Nature and Seriousness of the Danger Posed by Release

As detailed above, the Defendant's release poses a danger to the community.  Once he is no longer burdened by his flight from the Indictment, the Defendant will be able to assist Rodriguez-Cumba in continuing the drug trafficking organization while Rodriguez-Cumba remains detained pending trial.  On April 21, 2022, a grand jury sitting in the District of Puerto Rico returned a one count indictment—22-cr-173—charging Rodriguez-Cumba with Possessing Contraband in Prison.  The contraband associated with the one count is a cellular telephone that Rodriguez-Cumba had while detained at MDC—Guaynabo.

Detaining the Defendant pending trial will dramatically reduce the risk that he will continue his work on the "streets."  For those reasons, no conditions or combination of conditions can assure the safety of the community.

7.  [12] EMILIANO FELICIANO HERANDEZ,

a.  The Nature and Circumstances of the Offenses Charged

As detailed above, the Defendant's is a high-level member in an organization responsible for hundreds of kilograms of cocaine which causes thousands of deaths each year.[42] The Defendant helps oversee a cocaine distribution infrastructure in Puerto Rico that brings cocaine to Florida, New York, and Connecticut and obtains multi-millions in cash profits.  The seventy kilograms of cocaine recovered just from the Honda pilot have a value in Puerto Rico of over 1.2 million dollars.

As in *Columbo* and *Patriarca*, the Defendant's position as a high-ranking member within the Rodriguez-Cumba Drug Trafficking Organization warrants detention.  *See United States v. Colombo*, 777 F.2d 96, 99 (2nd Cir. 1985); *United States v. Patriarca*, 948 F 2d 789, 795 (1st Cir. 1991).  The organization is responsible for multiple murders and this organization poses a "risk to the public" and a "danger to the community" by its "consistent pattern of orchestrating a series of violent criminal operations." *Id.* at 99.  When it became apparent that members of law enforcement were surveilling him on September 10, 2021, Rodriguez-Cumba called the Defendant and entrusted him to remove kilograms of cocaine worth over a million dollars from Rodriguez-Cumba's residence.  The Defendant was also responsible for overseeing activities of the organization in New York and Connecticut.  This is demonstrated by the residences that appear in the Pretrial Services Report in both Connecticut and the Bronx.  ECF No 110 at 2.

Additionally, multiple firearms have been recovered from the Rodriguez-Cumba Drug Trafficking organization including a modified machine-gun.  The Defendant does not have a

---

[42] https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates (retrieved September 23, 2023)("2019 to 2021, cocaine-involved deaths rose nearly 54% to 24,486 death")

weapons permit that would justify possession of any of these weapons or the weapons he displays in his music videos. ECF No. 110 at 4.

Thus, based upon the Defendant's involvement in the Rodriguez-Cumba Drug-Trafficking organization, the nature and the circumstances of the charged offenses justify detaining the Defendant as a danger to the community.

b. The Weight of the Evidence

The weight of the evidence against the Defendant overwhelmingly supports detention. The charges in the Indictment will be proven with a variety of evidence acquired through in-depth investigations into the Defendant and the Rodriguez-Cumba Drug Trafficking Organization, not only in Puerto Rico but throughout the East Coast of the continental United States.

i. Physical Evidence

The government will prove its case against The Defendant through physical evidence. The government recovered approximately seventy kilograms of cocaine from a vehicle that the Defendant loaded with bags and subsequently abandoned. The Defendant's flight from the Honda Pilot—where members of the investigative team recovered seventy kilograms of cocaine—is video recorded, and the Defendant can be identified through his extensive tattoos. *See* . Through the execution of the second search warrant at the Residence where members of the investigative team recovered kilograms of cocaine matching the branding recovered from the Honda Pilot. ; . The government recovered drug ledgers from the search warrant, which detail the financial agreements between members of the Rodriguez-Cumba Drug Trafficking organization, including the Defendant who is listed under his alias "Dogi", and others. . There will also be evidence produced through extensive physical surveillance on the

date where the Defendant fled from the Honda Pilot. All told, the violations set forth in the Indictment incorporate 100 kilograms of seized cocaine.

### ii. Court-Authorized Searches of Electronic Devices

The Defendant's guilt will also be established through court-authorized searches of electronic devices. For example, law enforcement has identified WhatsApp text, video, and audio communications between a WhatsApp Account listed as "Jose Rodriguez-Cumba" and a WhatsApp account "Doggi Bueno" associated with "13474303418" and a picture of the Defendant. In those communications, despite offering no assets, there are photographs of currency counters. 0. There is a video of currency in the number in the tens of thousands of dollars. 1. There are photographs of packages and associated shipping information that is consistent with the modus operandi of the Rodriguez-Cumba Drug Trafficking Organization. 2. There are photographs of flight information to New York, where the Defendant oversaw the receipt side of the Rodriguez-Cumba Drug Trafficking Organization. There are additionally, seven phone calls between the Defendant and Rodriguez-Cumba on September 10, 2021, after Rodriguez-Cumba was stopped and before the seizure of seventy kilograms of cocaine from the Honda pilot.

The weight of the evidence substantiates the Defendant's role as a high-ranking and trusted member of the violent Rodriguez-Cumba Drug Trafficking Organization.

### c. The History and Characteristics of the Defendant
#### i. The Defendant's Lack of Employment and Music Videos

The Defendant has no listed employment for the past year and stated that he is a music producer and singer. ECF No. 110 at 3. The Defendant has posted a series of music videos

on youtube.com where the Defendant's music videos consistently display the Defendant possessing various firearms, scenes depicting robberies, carjackings, and murders.[43]

The Defendant's music videos would not only go to the Defendant's character, but parts would be admissible at trial against the Defendant. The First Amendment does not, "prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993). "Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like." *Id.* "Rap lyrics and tattoos are properly admitted, however, where they are relevant, and their probative value is not substantially outweighed by the danger of unfair prejudice." *See United States v. Moore,* 639 F.3d 443, 447–448 (8th Cir.2011) (affirming admission of profane and violent rap recordings over Fed.R.Evid. 403 challenge where lyrics were probative of defendant's participation in narcotics conspiracy); *United States v. Belfast, 611 F.3d 783, 820 (11th Cir.2010)* (holding that rap lyrics were relevant and their probative value not substantially outweighed by any unfair prejudice in case where lyrics were used to show that defendant was associated with his father Charles Taylor's Anti–Terrorism Unit, which tortured Sierra Leoneans in Liberia). *See United States v. Pierce*, 785 F. 3d 832, 840-841 (2nd Cir. 2015).

In a music video titled "REZO" the Defendant can be observed with three distinct pistols, including one with an extended magazine. 4; 5; 6; 7. Throughout the music video the Defendant is on a chair displaying multiple firearms for the camera, surrounded by masked individuals carrying automatic and semi-automatic weapons. The video subplot depicts

---

[43] https://www.youtube.com/user/eldoggyman79 (retrieved May 2, 2022)

multiple masked individuals gathering in a vehicle, preparing to carjack a vehicle, eventually carrying out the carjacking and in the process of executing the carjacking a masked individuals shoots the driver.  8.

Throughout the music video the Defendant alludes to firearms—at one point he states, "Rifles sound like batteries in a Skrillex track.  I'll put some inside of you while chilling and then do my time like meek milly.  You guys don't know the meaning of *power*.  And if you guys confront me, we'll be here waiting for you 24 hours."  5.  The Defendant states that he would shoot someone and do his prison time like Philadelphia area rapper Meek Mill who was sentenced to years in prison and a lengthy probation after being convicted of gun possession.[44]   Later the Defendant raps, "The Eddie Bauer, the rods and the sig Sauer.  I'll explode you like a baby shower balloon."  *Id.*  A Sig Sauer is a brand of a firearm, and the Defendant's reference to a ballon is a reference to shooting someone.   The Defendant plainly states, "That's why I don't even go to my mailbox without my gun."  *Id.*  Additionally, the Defendant suggests, "May god forgive me, but I am not going down because of a son of a bitch"

The Defendant also alludes to importation of cocaine stating, "Boats arrive through the coast."  5. This is a common method of drug trafficking in the District of Puerto Rico, as small vessels will arrive on the shoreline and transport hundreds of kilograms at a time.

In another public music video, titled "La Pistola" the Defendant is carrying what appears to be a gold-plated semi-automatic pistol. 9; 0.  The plot of the music video depicts a masked

---

[44] https://www.rollingstone.com/music/music-news/meek-mills-legal-troubles-a-history-117981/ (retrieved May 2, 2022)

individual with a revolver chasing down another individual and shooting him.[45]  In another music video titled "Confia" the Defendant is seen holding another pistol.[46]  1; 2.

Not only do the Defendant's music videos prove his familiarity with firearms, his membership in the narcotics conspiracy, pay tribute to deceased associates, but they glorify carjacking—a danger to the community that has plagued the District of Puerto Rico.[47]

Additionally, the last video posted to the ElDoggyTv account was posted on September 5, 2021, a mere five days before the Defendant abandoned the Honda Pilot with approximately seventy kilograms of cocaine.

### ii.  The Defendant's Drug Use and Criminal History

Not only is the Defendant unemployed but the Defendant smokes fifteen marijuana cigarettes a day and has a history of substance abuse where he took twenty-five pills a day of Percocet which contains oxycodone.  ECF No. 110 at 3.  The Defendant was also arrested and charged with Article 401 of the PR Controlled Substances law in 2015.  *Id* at 4.

### iii.  The Defendant's Concealment of Assets

The Defendant did not report any assets, liabilities, income or expenses to probation. ECF No. 110 at 3.  The Defendant was not forthcoming with probation about the assets that he has received from his involvement in the Rodriguez-Cumba drug trafficking organization. *See* ; 1.  The Defendant's failure to report these assets demonstrate the Defendants willingness to conceal his assets even after having been arrested.

---

[45] https://www.youtube.com/watch?v=8qR607L-7Uo (retrieved May 2, 2022)
[46] https://www.youtube.com/watch?v=WxiNuI8f9Ec (retrieved May 2, 2022)
[47] https://www.justice.gov/usao-pr/pr/carjacking-prevention-campaign (Retrieved April 26, 2022)

d. <u>The Nature and Seriousness of the Danger Posed by Release</u>

As detailed above, the Defendant's release poses a danger to the community. Once he is no longer burdened by his flight from the Indictment, the Defendant will be able to assist Rodriguez-Cumba in continuing the drug trafficking organization while Rodriguez-Cumba remains detained pending trial. On April 21, 2022, a grand jury sitting in the District of Puerto Rico returned a one count indictment—22-cr-173—charging Rodriguez-Cumba with Possessing Contraband in Prison. The contraband associated with the one count is a cellular telephone that Rodriguez-Cumba had while detained at MDC—Guaynabo.

Detaining the Defendant pending trial will dramatically reduce the risk that he will continue his work on the "streets." For those reasons, no conditions or combination of conditions can assure the safety of the community.

8. [17] CHRISTIAN PRADO,
   a. <u>The Nature and Circumstances of the Offenses Charged</u>

As detailed above, the Defendant's is a high-level member in an organization responsible for hundreds of kilograms of cocaine which causes thousands of deaths each year.[48] The Defendant helps oversee a cocaine distribution infrastructure in Puerto Rico that brings cocaine to Florida, New York, and Connecticut and obtains multi-millions in cash profits. The seventy kilograms of cocaine recovered just from the Honda pilot have a value in Puerto Rico of over 1.2 million dollars.

---

[48] https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates (retrieved September 23, 2023)("2019 to 2021, cocaine-involved deaths rose nearly 54% to 24,486 death")

As in *Columbo* and *Patriarca*, the Defendant's position as a high-ranking member within the Rodriguez-Cumba Drug Trafficking Organization warrants detention. *See United States v. Colombo*, 777 F.2d 96, 99 (2nd Cir. 1985); *United States v. Patriarca*, 948 F 2d 789, 795 (1st Cir. 1991). The organization is responsible for multiple murders and this organization poses a "risk to the public" and a "danger to the community" by its "consistent pattern of orchestrating a series of violent criminal operations." *Id.* at 99. When it became apparent that members of law enforcement were surveilling him on September 10, 2021, Rodriguez-Cumba called the Defendant and entrusted him to remove kilograms of cocaine worth over a million dollars from Rodriguez-Cumba's residence. The Defendant was also responsible for overseeing activities of the organization in New York and Connecticut. This is demonstrated by the residences that appear in the Pretrial Services Report in both Connecticut and the Bronx. ECF No 110 at 2.

Additionally, multiple firearms have been recovered from the Rodriguez-Cumba Drug Trafficking organization including a modified machine-gun. The Defendant does not have a weapons permit that would justify possession of any of these weapons or the weapons he displays in his music videos. ECF No. 110 at 4.

Thus, based upon the Defendant's involvement in the Rodriguez-Cumba Drug-Trafficking organization, the nature and the circumstances of the charged offenses justify detaining the Defendant as a danger to the community.

### b. The Weight of the Evidence

The weight of the evidence against the Defendant overwhelmingly supports detention. The charges in the Indictment will be proven with a variety of evidence acquired through in-depth investigations into the Defendant and the Rodriguez-Cumba Drug Trafficking

Organization, not only in Puerto Rico but throughout the East Coast of the continental United States.

### i. Physical Evidence

The government will prove its case against The Defendant through physical evidence. The government recovered approximately seventy kilograms of cocaine from a vehicle that the Defendant loaded with bags and subsequently abandoned. The Defendant's flight from the Honda Pilot—where members of the investigative team recovered seventy kilograms of cocaine—is video recorded, and the Defendant can be identified through his extensive tattoos. *See* . Through the execution of the second search warrant at the Residence where members of the investigative team recovered kilograms of cocaine matching the branding recovered from the Honda Pilot. ; . The government recovered drug ledgers from the search warrant, which detail the financial agreements between members of the Rodriguez-Cumba Drug Trafficking organization, including the Defendant who is listed under his alias "Dogi", and others. . There will also be evidence produced through extensive physical surveillance on the date where the Defendant fled from the Honda Pilot. All told, the violations set forth in the Indictment incorporate 100 kilograms of seized cocaine.

### ii. Court-Authorized Searches of Electronic Devices

The Defendant's guilt will also be established through court-authorized searches of electronic devices. For example, law enforcement has identified WhatsApp text, video, and audio communications between a WhatsApp Account listed as "Jose Rodriguez-Cumba" and a WhatsApp account "Doggi Bueno" associated with "13474303418" and a picture of the Defendant. In those communications, despite offering no assets, there are photographs of currency counters. 0. There is a video of currency in the number in the tens of thousands of

dollars.  1.  There are photographs of packages and associated shipping information that is consistent with the modus operandi of the Rodriguez-Cumba Drug Trafficking Organization. 2.  There are photographs of flight information to New York, where the Defendant oversaw the receipt side of the Rodriguez-Cumba Drug Trafficking Organization.  There are additionally, seven phone calls between the Defendant and Rodriguez-Cumba on September 10, 2021, after Rodriguez-Cumba was stopped and before the seizure of seventy kilograms of cocaine from the Honda pilot.

The weight of the evidence substantiates the Defendant's role as a high-ranking and trusted member of the violent Rodriguez-Cumba Drug Trafficking Organization.

c.  The History and Characteristics of the Defendant
i.  The Defendant's Lack of Employment and Music Videos

The Defendant has no listed employment for the past year and stated that he is a music producer and singer.  ECF No. 110 at 3.  The Defendant has posted a series of music videos on youtube.com where the Defendant's music videos consistently display the Defendant possessing various firearms, scenes depicting robberies, carjackings, and murders.[49]

The Defendant's music videos would not only go to the Defendant's character, but parts would be admissible at trial against the Defendant.  The First Amendment does not, "prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent."  *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993).  "Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like."  *Id.*   "Rap lyrics and tattoos are properly admitted, however, where they are relevant, and their probative value is not substantially

---

[49] https://www.youtube.com/user/eldoggyman79 (retrieved May 2, 2022)

outweighed by the danger of unfair prejudice." *See United States v. Moore,* 639 F.3d 443, 447–448 (8th Cir.2011) (affirming admission of profane and violent rap recordings over Fed.R.Evid. 403 challenge where lyrics were probative of defendant's participation in narcotics conspiracy); *United States v. Belfast, 611 F.3d 783, 820 (11th Cir.2010)* (holding that rap lyrics were relevant and their probative value not substantially outweighed by any unfair prejudice in case where lyrics were used to show that defendant was associated with his father Charles Taylor's Anti–Terrorism Unit, which tortured Sierra Leoneans in Liberia). *See United States v. Pierce,* 785 F. 3d 832, 840-841 (2nd Cir. 2015).

In a music video titled "REZO" the Defendant can be observed with three distinct pistols, including one with an extended magazine. 4; 5; 6; 7. Throughout the music video the Defendant is on a chair displaying multiple firearms for the camera, surrounded by masked individuals carrying automatic and semi-automatic weapons. The video subplot depicts multiple masked individuals gathering in a vehicle, preparing to carjack a vehicle, eventually carrying out the carjacking and in the process of executing the carjacking a masked individuals shoots the driver. 8.

Throughout the music video the Defendant alludes to firearms—at one point he states, "Rifles sound like batteries in a Skrillex track. I'll put some inside of you while chilling and then do my time like meek milly. You guys don't know the meaning of *power*. And if you guys confront me, we'll be here waiting for you 24 hours." 5. The Defendant states that he would shoot someone and do his prison time like Philadelphia area rapper Meek Mill who was sentenced to years in prison and a lengthy probation after being convicted of gun

possession.[50]  Later the Defendant raps, "The Eddie Bauer, the rods and the sig Sauer.  I'll explode you like a baby shower balloon."  *Id.*  A Sig Sauer is a brand of a firearm, and the Defendant's reference to a ballon is a reference to shooting someone.   The Defendant plainly states, "That's why I don't even go to my mailbox without my gun."  *Id.*  Additionally, the Defendant suggests, "May god forgive me, but I am not going down because of a son of a bitch"

The Defendant also alludes to importation of cocaine stating, "Boats arrive through the coast."  5. This is a common method of drug trafficking in the District of Puerto Rico, as small vessels will arrive on the shoreline and transport hundreds of kilograms at a time.

In another public music video, titled "La Pistola" the Defendant is carrying what appears to be a gold-plated semi-automatic pistol. 9; 0.  The plot of the music video depicts a masked individual with a revolver chasing down another individual and shooting him.[51]  In another music video titled "Confia" the Defendant is seen holding another pistol.[52]  1; 2.

Not only do the Defendant's music videos prove his familiarity with firearms, his membership in the narcotics conspiracy, pay tribute to deceased associates, but they glorify carjacking—a danger to the community that has plagued the District of Puerto Rico.[53]

Additionally, the last video posted to the ElDoggyTv account was posted on September 5, 2021, a mere five days before the Defendant abandoned the Honda Pilot with approximately seventy kilograms of cocaine.

---

[50] https://www.rollingstone.com/music/music-news/meek-mills-legal-troubles-a-history-117981/ (retrieved May 2, 2022)
[51] https://www.youtube.com/watch?v=8qR607L-7Uo (retrieved May 2, 2022)
[52] https://www.youtube.com/watch?v=WxiNuI8f9Ec (retrieved May 2, 2022)
[53] https://www.justice.gov/usao-pr/pr/carjacking-prevention-campaign (Retrieved April 26, 2022)

ii.  <u>The Defendant's Drug Use and Criminal History</u>

Not only is the Defendant unemployed but the Defendant smokes fifteen marijuana cigarettes a day and has a history of substance abuse where he took twenty-five pills a day of Percocet which contains oxycodone.  ECF No. 110 at 3.  The Defendant was also arrested and charged with Article 401 of the PR Controlled Substances law in 2015.  *Id* at 4.

iii.  <u>The Defendant's Concealment of Assets</u>

The Defendant did not report any assets, liabilities, income or expenses to probation.  ECF No. 110 at 3.  The Defendant was not forthcoming with probation about the assets that he has received from his involvement in the Rodriguez-Cumba drug trafficking organization.  *See* ; 1.  The Defendant's failure to report these assets demonstrate the Defendants willingness to conceal his assets even after having been arrested.

d.  <u>The Nature and Seriousness of the Danger Posed by Release</u>

As detailed above, the Defendant's release poses a danger to the community.  Once he is no longer burdened by his flight from the Indictment, the Defendant will be able to assist Rodriguez-Cumba in continuing the drug trafficking organization while Rodriguez-Cumba remains detained pending trial.  On April 21, 2022, a grand jury sitting in the District of Puerto Rico returned a one count indictment—22-cr-173—charging Rodriguez-Cumba with Possessing Contraband in Prison.  The contraband associated with the one count is a cellular telephone that Rodriguez-Cumba had while detained at MDC—Guaynabo.

Detaining the Defendant pending trial will dramatically reduce the risk that he will continue his work on the "streets."  For those reasons, no conditions or combination of conditions can assure the safety of the community.

9.  [18] LUIS ALBERTO BOURDON-ROMAN,

a. <u>The Nature and Circumstances of the Offenses Charged</u>

As detailed above, the Defendant's is a high-level member in an organization responsible for hundreds of kilograms of cocaine which causes thousands of deaths each year.[54] The Defendant helps oversee a cocaine distribution infrastructure in Puerto Rico that brings cocaine to Florida, New York, and Connecticut and obtains multi-millions in cash profits. The seventy kilograms of cocaine recovered just from the Honda pilot have a value in Puerto Rico of over 1.2 million dollars.

As in *Columbo* and *Patriarca*, the Defendant's position as a high-ranking member within the Rodriguez-Cumba Drug Trafficking Organization warrants detention. *See United States v. Colombo*, 777 F.2d 96, 99 (2nd Cir. 1985); *United States v. Patriarca*, 948 F 2d 789, 795 (1st Cir. 1991). The organization is responsible for multiple murders and this organization poses a "risk to the public" and a "danger to the community" by its "consistent pattern of orchestrating a series of violent criminal operations." *Id.* at 99. When it became apparent that members of law enforcement were surveilling him on September 10, 2021, Rodriguez-Cumba called the Defendant and entrusted him to remove kilograms of cocaine worth over a million dollars from Rodriguez-Cumba's residence. The Defendant was also responsible for overseeing activities of the organization in New York and Connecticut. This is demonstrated by the residences that appear in the Pretrial Services Report in both Connecticut and the Bronx. ECF No 110 at 2.

Additionally, multiple firearms have been recovered from the Rodriguez-Cumba Drug Trafficking organization including a modified machine-gun. The Defendant does not have a

---

[54] https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates (retrieved September 23, 2023)("2019 to 2021, cocaine-involved deaths rose nearly 54% to 24,486 death")

weapons permit that would justify possession of any of these weapons or the weapons he displays in his music videos. ECF No. 110 at 4.

Thus, based upon the Defendant's involvement in the Rodriguez-Cumba Drug-Trafficking organization, the nature and the circumstances of the charged offenses justify detaining the Defendant as a danger to the community.

b. The Weight of the Evidence

The weight of the evidence against the Defendant overwhelmingly supports detention. The charges in the Indictment will be proven with a variety of evidence acquired through in-depth investigations into the Defendant and the Rodriguez-Cumba Drug Trafficking Organization, not only in Puerto Rico but throughout the East Coast of the continental United States.

i. Physical Evidence

The government will prove its case against The Defendant through physical evidence. The government recovered approximately seventy kilograms of cocaine from a vehicle that the Defendant loaded with bags and subsequently abandoned. The Defendant's flight from the Honda Pilot—where members of the investigative team recovered seventy kilograms of cocaine—is video recorded, and the Defendant can be identified through his extensive tattoos. *See* . Through the execution of the second search warrant at the Residence where members of the investigative team recovered kilograms of cocaine matching the branding recovered from the Honda Pilot. ; . The government recovered drug ledgers from the search warrant, which detail the financial agreements between members of the Rodriguez-Cumba Drug Trafficking organization, including the Defendant who is listed under his alias "Dogi", and others. . There will also be evidence produced through extensive physical surveillance on the

date where the Defendant fled from the Honda Pilot. All told, the violations set forth in the Indictment incorporate 100 kilograms of seized cocaine.

### ii. Court-Authorized Searches of Electronic Devices

The Defendant's guilt will also be established through court-authorized searches of electronic devices. For example, law enforcement has identified WhatsApp text, video, and audio communications between a WhatsApp Account listed as "Jose Rodriguez-Cumba" and a WhatsApp account "Doggi Bueno" associated with "13474303418" and a picture of the Defendant. In those communications, despite offering no assets, there are photographs of currency counters. 0. There is a video of currency in the number in the tens of thousands of dollars. 1. There are photographs of packages and associated shipping information that is consistent with the modus operandi of the Rodriguez-Cumba Drug Trafficking Organization. 2. There are photographs of flight information to New York, where the Defendant oversaw the receipt side of the Rodriguez-Cumba Drug Trafficking Organization. There are additionally, seven phone calls between the Defendant and Rodriguez-Cumba on September 10, 2021, after Rodriguez-Cumba was stopped and before the seizure of seventy kilograms of cocaine from the Honda pilot.

The weight of the evidence substantiates the Defendant's role as a high-ranking and trusted member of the violent Rodriguez-Cumba Drug Trafficking Organization.

### c. The History and Characteristics of the Defendant
#### i. The Defendant's Lack of Employment and Music Videos

The Defendant has no listed employment for the past year and stated that he is a music producer and singer. ECF No. 110 at 3. The Defendant has posted a series of music videos

on youtube.com where the Defendant's music videos consistently display the Defendant possessing various firearms, scenes depicting robberies, carjackings, and murders.[55]

The Defendant's music videos would not only go to the Defendant's character, but parts would be admissible at trial against the Defendant. The First Amendment does not, "prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993). "Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like." *Id.* "Rap lyrics and tattoos are properly admitted, however, where they are relevant, and their probative value is not substantially outweighed by the danger of unfair prejudice." *See United States v. Moore,* 639 F.3d 443, 447–448 (8th Cir.2011) (affirming admission of profane and violent rap recordings over Fed.R.Evid. 403 challenge where lyrics were probative of defendant's participation in narcotics conspiracy); *United States v. Belfast, 611 F.3d 783, 820 (11th Cir.2010)* (holding that rap lyrics were relevant and their probative value not substantially outweighed by any unfair prejudice in case where lyrics were used to show that defendant was associated with his father Charles Taylor's Anti–Terrorism Unit, which tortured Sierra Leoneans in Liberia). *See United States v. Pierce*, 785 F. 3d 832, 840-841 (2nd Cir. 2015).

In a music video titled "REZO" the Defendant can be observed with three distinct pistols, including one with an extended magazine. 4; 5; 6; 7. Throughout the music video the Defendant is on a chair displaying multiple firearms for the camera, surrounded by masked individuals carrying automatic and semi-automatic weapons. The video subplot depicts

---

[55] https://www.youtube.com/user/eldoggyman79 (retrieved May 2, 2022)

multiple masked individuals gathering in a vehicle, preparing to carjack a vehicle, eventually carrying out the carjacking and in the process of executing the carjacking a masked individuals shoots the driver.  8.

Throughout the music video the Defendant alludes to firearms—at one point he states, "Rifles sound like batteries in a Skrillex track.  I'll put some inside of you while chilling and then do my time like meek milly.  You guys don't know the meaning of *power*.  And if you guys confront me, we'll be here waiting for you 24 hours."  5.  The Defendant states that he would shoot someone and do his prison time like Philadelphia area rapper Meek Mill who was sentenced to years in prison and a lengthy probation after being convicted of gun possession.[56]  Later the Defendant raps, "The Eddie Bauer, the rods and the sig Sauer.  I'll explode you like a baby shower balloon."  *Id.*  A Sig Sauer is a brand of a firearm, and the Defendant's reference to a ballon is a reference to shooting someone.   The Defendant plainly states, "That's why I don't even go to my mailbox without my gun."  *Id.*  Additionally, the Defendant suggests, "May god forgive me, but I am not going down because of a son of a bitch"

The Defendant also alludes to importation of cocaine stating, "Boats arrive through the coast."  5. This is a common method of drug trafficking in the District of Puerto Rico, as small vessels will arrive on the shoreline and transport hundreds of kilograms at a time.

In another public music video, titled "La Pistola" the Defendant is carrying what appears to be a gold-plated semi-automatic pistol. 9; 0.  The plot of the music video depicts a masked

---

[56] https://www.rollingstone.com/music/music-news/meek-mills-legal-troubles-a-history-117981/ (retrieved May 2, 2022)

individual with a revolver chasing down another individual and shooting him.[57]  In another music video titled "Confia" the Defendant is seen holding another pistol.[58]  1; 2.

Not only do the Defendant's music videos prove his familiarity with firearms, his membership in the narcotics conspiracy, pay tribute to deceased associates, but they glorify carjacking—a danger to the community that has plagued the District of Puerto Rico.[59]

Additionally, the last video posted to the ElDoggyTv account was posted on September 5, 2021, a mere five days before the Defendant abandoned the Honda Pilot with approximately seventy kilograms of cocaine.

ii.   <u>The Defendant's Drug Use and Criminal History</u>

Not only is the Defendant unemployed but the Defendant smokes fifteen marijuana cigarettes a day and has a history of substance abuse where he took twenty-five pills a day of Percocet which contains oxycodone.  ECF No. 110 at 3.  The Defendant was also arrested and charged with Article 401 of the PR Controlled Substances law in 2015.  *Id* at 4.

iii.   <u>The Defendant's Concealment of Assets</u>

The Defendant did not report any assets, liabilities, income or expenses to probation. ECF No. 110 at 3.  The Defendant was not forthcoming with probation about the assets that he has received from his involvement in the Rodriguez-Cumba drug trafficking organization. *See* ; 1.  The Defendant's failure to report these assets demonstrate the Defendants willingness to conceal his assets even after having been arrested.

d.   <u>The Nature and Seriousness of the Danger Posed by Release</u>

---

[57] https://www.youtube.com/watch?v=8qR607L-7Uo (retrieved May 2, 2022)
[58] https://www.youtube.com/watch?v=WxiNul8f9Ec (retrieved May 2, 2022)
[59] https://www.justice.gov/usao-pr/pr/carjacking-prevention-campaign (Retrieved April 26, 2022)

As detailed above, the Defendant's release poses a danger to the community. Once he is no longer burdened by his flight from the Indictment, the Defendant will be able to assist Rodriguez-Cumba in continuing the drug trafficking organization while Rodriguez-Cumba remains detained pending trial. On April 21, 2022, a grand jury sitting in the District of Puerto Rico returned a one count indictment—22-cr-173—charging Rodriguez-Cumba with Possessing Contraband in Prison. The contraband associated with the one count is a cellular telephone that Rodriguez-Cumba had while detained at MDC—Guaynabo.

Detaining the Defendant pending trial will dramatically reduce the risk that he will continue his work on the "streets." For those reasons, no conditions or combination of conditions can assure the safety of the community.

10. [19] EDWIN CANDELARIA-RAMOS,
   a. <u>The Nature and Circumstances of the Offenses Charged</u>

As detailed above, the Defendant's is a high-level member in an organization responsible for hundreds of kilograms of cocaine which causes thousands of deaths each year.[60] The Defendant helps oversee a cocaine distribution infrastructure in Puerto Rico that brings cocaine to Florida, New York, and Connecticut and obtains multi-millions in cash profits. The seventy kilograms of cocaine recovered just from the Honda pilot have a value in Puerto Rico of over 1.2 million dollars.

As in *Columbo* and *Patriarca*, the Defendant's position as a high-ranking member within the Rodriguez-Cumba Drug Trafficking Organization warrants detention. *See United States v. Colombo*, 777 F.2d 96, 99 (2nd Cir. 1985); *United States v. Patriarca*, 948 F 2d 789, 795 (1st Cir.

---

[60] https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates (retrieved September 23, 2023)("2019 to 2021, cocaine-involved deaths rose nearly 54% to 24,486 death")

1991). The organization is responsible for multiple murders and this organization poses a "risk to the public" and a "danger to the community" by its "consistent pattern of orchestrating a series of violent criminal operations." *Id.* at 99. When it became apparent that members of law enforcement were surveilling him on September 10, 2021, Rodriguez-Cumba called the Defendant and entrusted him to remove kilograms of cocaine worth over a million dollars from Rodriguez-Cumba's residence. The Defendant was also responsible for overseeing activities of the organization in New York and Connecticut. This is demonstrated by the residences that appear in the Pretrial Services Report in both Connecticut and the Bronx. ECF No 110 at 2.

Additionally, multiple firearms have been recovered from the Rodriguez-Cumba Drug Trafficking organization including a modified machine-gun. The Defendant does not have a weapons permit that would justify possession of any of these weapons or the weapons he displays in his music videos. ECF No. 110 at 4.

Thus, based upon the Defendant's involvement in the Rodriguez-Cumba Drug-Trafficking organization, the nature and the circumstances of the charged offenses justify detaining the Defendant as a danger to the community.

### b. The Weight of the Evidence

The weight of the evidence against the Defendant overwhelmingly supports detention. The charges in the Indictment will be proven with a variety of evidence acquired through in-depth investigations into the Defendant and the Rodriguez-Cumba Drug Trafficking Organization, not only in Puerto Rico but throughout the East Coast of the continental United States.

i.  Physical Evidence

The government will prove its case against The Defendant through physical evidence. The government recovered approximately seventy kilograms of cocaine from a vehicle that the Defendant loaded with bags and subsequently abandoned.  The Defendant's flight from the Honda Pilot—where members of the investigative team recovered seventy kilograms of cocaine—is video recorded, and the Defendant can be identified through his extensive tattoos. *See* .  Through the execution of the second search warrant at the Residence where members of the investigative team recovered kilograms of cocaine matching the branding recovered from the Honda Pilot.  ; .  The government recovered drug ledgers from the search warrant, which detail the financial agreements between members of the Rodriguez-Cumba Drug Trafficking organization, including the Defendant who is listed under his alias "Dogi", and others. .  There will also be evidence produced through extensive physical surveillance on the date where the Defendant fled from the Honda Pilot.  All told, the violations set forth in the Indictment incorporate 100 kilograms of seized cocaine.

ii.  Court-Authorized Searches of Electronic Devices

The Defendant's guilt will also be established through court-authorized searches of electronic devices.  For example, law enforcement has identified WhatsApp text, video, and audio communications between a WhatsApp Account listed as "Jose Rodriguez-Cumba" and a WhatsApp account "Doggi Bueno" associated with "13474303418" and a picture of the Defendant.  In those communications, despite offering no assets, there are photographs of currency counters.  0.  There is a video of currency in the number in the tens of thousands of dollars.  1.  There are photographs of packages and associated shipping information that is consistent with the modus operandi of the Rodriguez-Cumba Drug Trafficking Organization.

2.  There are photographs of flight information to New York, where the Defendant oversaw the receipt side of the Rodriguez-Cumba Drug Trafficking Organization.   There are additionally, seven phone calls between the Defendant and Rodriguez-Cumba on September 10, 2021, after Rodriguez-Cumba was stopped and before the seizure of seventy kilograms of cocaine from the Honda pilot.

The weight of the evidence substantiates the Defendant's role as a high-ranking and trusted member of the violent Rodriguez-Cumba Drug Trafficking Organization.

c.  <u>The History and Characteristics of the Defendant</u>
i.  <u>The Defendant's Lack of Employment and Music Videos</u>

The Defendant has no listed employment for the past year and stated that he is a music producer and singer.  ECF No. 110 at 3.  The Defendant has posted a series of music videos on youtube.com where the Defendant's music videos consistently display the Defendant possessing various firearms, scenes depicting robberies, carjackings, and murders.[61]

The Defendant's music videos would not only go to the Defendant's character, but parts would be admissible at trial against the Defendant.  The First Amendment does not, "prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent."  *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993).  "Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like." *Id.*   "Rap lyrics and tattoos are properly admitted, however, where they are relevant, and their probative value is not substantially outweighed by the danger of unfair prejudice."  *See United States v. Moore,* 639 F.3d 443, 447–448  (8th  Cir.2011) (affirming  admission  of  profane  and  violent  rap  recordings

---

[61] https://www.youtube.com/user/eldoggyman79 (retrieved May 2, 2022)

over Fed.R.Evid. 403 challenge where lyrics were probative of defendant's participation in narcotics conspiracy); *United States v. Belfast, 611 F.3d 783, 820 (11th Cir.2010)* (holding that rap lyrics were relevant and their probative value not substantially outweighed by any unfair prejudice in case where lyrics were used to show that defendant was associated with his father Charles Taylor's Anti–Terrorism Unit, which tortured Sierra Leoneans in Liberia). *See United States v. Pierce*, 785 F. 3d 832, 840-841 (2nd Cir. 2015).

In a music video titled "REZO" the Defendant can be observed with three distinct pistols, including one with an extended magazine.  4; 5; 6; 7.  Throughout the music video the Defendant is on a chair displaying multiple firearms for the camera, surrounded by masked individuals carrying automatic and semi-automatic weapons.  The video subplot depicts multiple masked individuals gathering in a vehicle, preparing to carjack a vehicle, eventually carrying out the carjacking and in the process of executing the carjacking a masked individuals shoots the driver.  8.

Throughout the music video the Defendant alludes to firearms—at one point he states, "Rifles sound like batteries in a Skrillex track.  I'll put some inside of you while chilling and then do my time like meek milly.  You guys don't know the meaning of *power*.  And if you guys confront me, we'll be here waiting for you 24 hours."  5.  The Defendant states that he would shoot someone and do his prison time like Philadelphia area rapper Meek Mill who was sentenced to years in prison and a lengthy probation after being convicted of gun possession.[62]   Later the Defendant raps, "The Eddie Bauer, the rods and the sig Sauer.  I'll explode you like a baby shower balloon."  *Id.* A Sig Sauer is a brand of a firearm, and the

---

[62] https://www.rollingstone.com/music/music-news/meek-mills-legal-troubles-a-history-117981/ (retrieved May 2, 2022)

Defendant's reference to a ballon is a reference to shooting someone. The Defendant plainly states, "That's why I don't even go to my mailbox without my gun." *Id.* Additionally, the Defendant suggests, "May god forgive me, but I am not going down because of a son of a bitch"

The Defendant also alludes to importation of cocaine stating, "Boats arrive through the coast." 5. This is a common method of drug trafficking in the District of Puerto Rico, as small vessels will arrive on the shoreline and transport hundreds of kilograms at a time.

In another public music video, titled "La Pistola" the Defendant is carrying what appears to be a gold-plated semi-automatic pistol. 9; 0. The plot of the music video depicts a masked individual with a revolver chasing down another individual and shooting him.[63] In another music video titled "Confia" the Defendant is seen holding another pistol.[64] 1; 2.

Not only do the Defendant's music videos prove his familiarity with firearms, his membership in the narcotics conspiracy, pay tribute to deceased associates, but they glorify carjacking—a danger to the community that has plagued the District of Puerto Rico.[65]

Additionally, the last video posted to the ElDoggyTv account was posted on September 5, 2021, a mere five days before the Defendant abandoned the Honda Pilot with approximately seventy kilograms of cocaine.

### ii. The Defendant's Drug Use and Criminal History

Not only is the Defendant unemployed but the Defendant smokes fifteen marijuana cigarettes a day and has a history of substance abuse where he took twenty-five pills a day of Percocet

---

[63] https://www.youtube.com/watch?v=8qR607L-7Uo (retrieved May 2, 2022)
[64] https://www.youtube.com/watch?v=WxiNul8f9Ec (retrieved May 2, 2022)
[65] https://www.justice.gov/usao-pr/pr/carjacking-prevention-campaign (Retrieved April 26, 2022)

which contains oxycodone.  ECF No. 110 at 3.  The Defendant was also arrested and charged with Article 401 of the PR Controlled Substances law in 2015.  *Id* at 4.

### iii.  The Defendant's Concealment of Assets

The Defendant did not report any assets, liabilities, income or expenses to probation. ECF No. 110 at 3.  The Defendant was not forthcoming with probation about the assets that he has received from his involvement in the Rodriguez-Cumba drug trafficking organization. *See* ; 1.  The Defendant's failure to report these assets demonstrate the Defendants willingness to conceal his assets even after having been arrested.

### d.  The Nature and Seriousness of the Danger Posed by Release

As detailed above, the Defendant's release poses a danger to the community.  Once he is no longer burdened by his flight from the Indictment, the Defendant will be able to assist Rodriguez-Cumba in continuing the drug trafficking organization while Rodriguez-Cumba remains detained pending trial.  On April 21, 2022, a grand jury sitting in the District of Puerto Rico returned a one count indictment—22-cr-173—charging Rodriguez-Cumba with Possessing Contraband in Prison.  The contraband associated with the one count is a cellular telephone that Rodriguez-Cumba had while detained at MDC—Guaynabo.

Detaining the Defendant pending trial will dramatically reduce the risk that he will continue his work on the "streets."  For those reasons, no conditions or combination of conditions can assure the safety of the community.

### 11.  The Nature and Circumstances of the Offenses Charged

As detailed above, the Defendant's is a high-level member in an organization responsible for hundreds of kilograms of cocaine which causes thousands of deaths each

year.[66] The Defendant helps oversee a cocaine distribution infrastructure in Puerto Rico that brings cocaine to Florida, New York, and Connecticut and obtains multi-millions in cash profits. The seventy kilograms of cocaine recovered just from the Honda pilot have a value in Puerto Rico of over 1.2 million dollars.

As in *Columbo* and *Patriarca*, the Defendant's position as a high-ranking member within the Rodriguez-Cumba Drug Trafficking Organization warrants detention. *See United States v. Colombo*, 777 F.2d 96, 99 (2nd Cir. 1985); *United States v. Patriarca*, 948 F 2d 789, 795 (1st Cir. 1991). The organization is responsible for multiple murders and this organization poses a "risk to the public" and a "danger to the community" by its "consistent pattern of orchestrating a series of violent criminal operations." *Id.* at 99. When it became apparent that members of law enforcement were surveilling him on September 10, 2021, Rodriguez-Cumba called the Defendant and entrusted him to remove kilograms of cocaine worth over a million dollars from Rodriguez-Cumba's residence. The Defendant was also responsible for overseeing activities of the organization in New York and Connecticut. This is demonstrated by the residences that appear in the Pretrial Services Report in both Connecticut and the Bronx. ECF No 110 at 2.

Additionally, multiple firearms have been recovered from the Rodriguez-Cumba Drug Trafficking organization including a modified machine-gun. The Defendant does not have a weapons permit that would justify possession of any of these weapons or the weapons he displays in his music videos. ECF No. 110 at 4.

---

[66] https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates (retrieved September 23, 2023)("2019 to 2021, cocaine-involved deaths rose nearly 54% to 24,486 death")

Thus, based upon the Defendant's involvement in the Rodriguez-Cumba Drug-Trafficking organization, the nature and the circumstances of the charged offenses justify detaining the Defendant as a danger to the community.

12. The Weight of the Evidence

The weight of the evidence against the Defendant overwhelmingly supports detention. The charges in the Indictment will be proven with a variety of evidence acquired through in-depth investigations into the Defendant and the Rodriguez-Cumba Drug Trafficking Organization, not only in Puerto Rico but throughout the East Coast of the continental United States.

a. Physical Evidence

The government will prove its case against The Defendant through physical evidence. The government recovered approximately seventy kilograms of cocaine from a vehicle that the Defendant loaded with bags and subsequently abandoned. The Defendant's flight from the Honda Pilot—where members of the investigative team recovered seventy kilograms of cocaine—is video recorded, and the Defendant can be identified through his extensive tattoos. *See* . Through the execution of the second search warrant at the Residence where members of the investigative team recovered kilograms of cocaine matching the branding recovered from the Honda Pilot. ; . The government recovered drug ledgers from the search warrant, which detail the financial agreements between members of the Rodriguez-Cumba Drug Trafficking organization, including the Defendant who is listed under his alias "Dogi", and others. . There will also be evidence produced through extensive physical surveillance on the date where the Defendant fled from the Honda Pilot. All told, the violations set forth in the Indictment incorporate 100 kilograms of seized cocaine.

b.  Court-Authorized Searches of Electronic Devices

The Defendant's guilt will also be established through court-authorized searches of electronic devices.  For example, law enforcement has identified WhatsApp text, video, and audio communications between a WhatsApp Account listed as "Jose Rodriguez-Cumba" and a WhatsApp account "Doggi Bueno" associated with "13474303418" and a picture of the Defendant.  In those communications, despite offering no assets, there are photographs of currency counters.  0.  There is a video of currency in the number in the tens of thousands of dollars.  1.  There are photographs of packages and associated shipping information that is consistent with the modus operandi of the Rodriguez-Cumba Drug Trafficking Organization.  2.  There are photographs of flight information to New York, where the Defendant oversaw the receipt side of the Rodriguez-Cumba Drug Trafficking Organization. There are additionally, seven phone calls between the Defendant and Rodriguez-Cumba on September 10, 2021, after Rodriguez-Cumba was stopped and before the seizure of seventy kilograms of cocaine from the Honda pilot.

The weight of the evidence substantiates the Defendant's role as a high-ranking and trusted member of the violent Rodriguez-Cumba Drug Trafficking Organization.

13. The History and Characteristics of the Defendant

a.  The Defendant's Lack of Employment and Music Videos

The Defendant has no listed employment for the past year and stated that he is a music producer and singer.  ECF No. 110 at 3.  The Defendant has posted a series of music videos

on youtube.com where the Defendant's music videos consistently display the Defendant possessing various firearms, scenes depicting robberies, carjackings, and murders.[67]

The Defendant's music videos would not only go to the Defendant's character, but parts would be admissible at trial against the Defendant. The First Amendment does not, "prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993). "Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like." *Id.* "Rap lyrics and tattoos are properly admitted, however, where they are relevant, and their probative value is not substantially outweighed by the danger of unfair prejudice." *See United States v. Moore,* 639 F.3d 443, 447–448 (8th Cir.2011) (affirming admission of profane and violent rap recordings over Fed.R.Evid. 403 challenge where lyrics were probative of defendant's participation in narcotics conspiracy); *United States v. Belfast, 611 F.3d 783, 820 (11th Cir.2010)* (holding that rap lyrics were relevant and their probative value not substantially outweighed by any unfair prejudice in case where lyrics were used to show that defendant was associated with his father Charles Taylor's Anti–Terrorism Unit, which tortured Sierra Leoneans in Liberia). *See United States v. Pierce*, 785 F. 3d 832, 840-841 (2nd Cir. 2015).

In a music video titled "REZO" the Defendant can be observed with three distinct pistols, including one with an extended magazine. 4; 5; 6; 7. Throughout the music video the Defendant is on a chair displaying multiple firearms for the camera, surrounded by masked individuals carrying automatic and semi-automatic weapons. The video subplot

---

[67] https://www.youtube.com/user/eldoggyman79 (retrieved May 2, 2022)

depicts multiple masked individuals gathering in a vehicle, preparing to carjack a vehicle, eventually carrying out the carjacking and in the process of executing the carjacking a masked individuals shoots the driver.  8.

Throughout the music video the Defendant alludes to firearms—at one point he states, "Rifles sound like batteries in a Skrillex track.  I'll put some inside of you while chilling and then do my time like meek milly.  You guys don't know the meaning of *power*.  And if you guys confront me, we'll be here waiting for you 24 hours."  5.  The Defendant states that he would shoot someone and do his prison time like Philadelphia area rapper Meek Mill who was sentenced to years in prison and a lengthy probation after being convicted of gun possession.[68]  Later the Defendant raps, "The Eddie Bauer, the rods and the sig Sauer.  I'll explode you like a baby shower balloon."  *Id.*  A Sig Sauer is a brand of a firearm, and the Defendant's reference to a ballon is a reference to shooting someone.   The Defendant plainly states, "That's why I don't even go to my mailbox without my gun."  *Id.*  Additionally, the Defendant suggests, "May god forgive me, but I am not going down because of a son of a bitch"

The Defendant also alludes to importation of cocaine stating, "Boats arrive through the coast."  5. This is a common method of drug trafficking in the District of Puerto Rico, as small vessels will arrive on the shoreline and transport hundreds of kilograms at a time.

In another public music video, titled "La Pistola" the Defendant is carrying what appears to be a gold-plated semi-automatic pistol. 9; 0.  The plot of the music video depicts a

---

[68] https://www.rollingstone.com/music/music-news/meek-mills-legal-troubles-a-history-117981/ (retrieved May 2, 2022)

masked individual with a revolver chasing down another individual and shooting him.[69]  In another music video titled "Confia" the Defendant is seen holding another pistol.[70]  1; 2.

Not only do the Defendant's music videos prove his familiarity with firearms, his membership in the narcotics conspiracy, pay tribute to deceased associates, but they glorify carjacking—a danger to the community that has plagued the District of Puerto Rico.[71]

Additionally, the last video posted to the ElDoggyTv account was posted on September 5, 2021, a mere five days before the Defendant abandoned the Honda Pilot with approximately seventy kilograms of cocaine.

### b. The Defendant's Drug Use and Criminal History

Not only is the Defendant unemployed but the Defendant smokes fifteen marijuana cigarettes a day and has a history of substance abuse where he took twenty-five pills a day of Percocet which contains oxycodone.  ECF No. 110 at 3.  The Defendant was also arrested and charged with Article 401 of the PR Controlled Substances law in 2015.  *Id* at 4.

### c. The Defendant's Concealment of Assets

The Defendant did not report any assets, liabilities, income or expenses to probation. ECF No. 110 at 3.  The Defendant was not forthcoming with probation about the assets that he has received from his involvement in the Rodriguez-Cumba drug trafficking organization. *See* ; 1.  The Defendant's failure to report these assets demonstrate the Defendants willingness to conceal his assets even after having been arrested.

### 14. The Nature and Seriousness of the Danger Posed by Release

---

[69] https://www.youtube.com/watch?v=8qR607L-7Uo (retrieved May 2, 2022)
[70] https://www.youtube.com/watch?v=WxiNuI8f9Ec (retrieved May 2, 2022)
[71] https://www.justice.gov/usao-pr/pr/carjacking-prevention-campaign (Retrieved April 26, 2022)

As detailed above, the Defendant's release poses a danger to the community. Once he is no longer burdened by his flight from the Indictment, the Defendant will be able to assist Rodriguez-Cumba in continuing the drug trafficking organization while Rodriguez-Cumba remains detained pending trial. On April 21, 2022, a grand jury sitting in the District of Puerto Rico returned a one count indictment—22-cr-173—charging Rodriguez-Cumba with Possessing Contraband in Prison. The contraband associated with the one count is a cellular telephone that Rodriguez-Cumba had while detained at MDC—Guaynabo.

Detaining the Defendant pending trial will dramatically reduce the risk that he will continue his work on the "streets." For those reasons, no conditions or combination of conditions can assure the safety of the community.

C.  Release of the Defendant Poses a Guarantee of Flight

First, the Defendant's initial flight from the Honda Pilot demonstrates the Defendants first impulse defaults towards flight. Moreover, the Defendant admitted to his mother that he was wanted by the authorities and would flee the jurisdiction. ECF No. 110 at 2. ("once the defendant knew that he was Wanted by the authorities, he told his mother he was going to leave the house so she wouldn't be involved in any problems. During months, he left for New York and Ms. Cubero Landin reportedly had no contact or knowledge of the defendant's exact whereabouts."). The Defendant subsequently fled the jurisdiction from this Indictment to New York. *Id.* Additionally, during his flight he sold his Jeep Grand Cherokee to further obstruct law enforcement's ability to locate him. Not only did he sell his vehicle, but the person who he sold the vehicle to was willingly to lie to law enforcement instead of assisting law enforcement and giving the Defendant additional time to flee the jurisdiction while law

enforcement was forced to investigate the lie Martinez-Concepcion told members of the investigative team about the Defendant.

Second, if convicted of Count One or Count Two of the Indictment, the Defendant faces possible life imprisonment. Count One and Count Two charged in the Indictment carry a ten-year mandatory minimum sentence of incarceration. A base offense level for seventy kilograms recovered from just the Honda Pilot without any specific offense characteristics or chapter three adjustments dictate a sentence of at least 151-188 months imprisonment. *See* U.S.S.G. § 2D1.1(c)(3). The Defendant has every incentive to flee from prosecution and, having already fled the Indictment, he has a proven track record of choosing flight rather than facing prosecution.

D. <u>The Defendants will continue to Obstruct Justice if Released</u>

Similarly, the Defendant has already demonstrated his willingness to obstruct justice and the investigation if not detained. The Defendant received a series of phone calls from Rodriguez-Cumba and immediately started removing kilograms of cocaine and marijuana out of Rodriguez-Cumba's residence which was under surveillance. The only rationale for this would be to help prevent the cocaine's seizure from the investigative team and obstruct the investigation into the Rodriguez-Cumba Drug Trafficking Organization. It was only once the Defendant noticed the investigative team, did he abandon the kilograms of cocaine and flee.

Further, mere days after the return of the Indictment and the arrest of Rodriguez-Cumba, the Defendant sold his Jeep Grand Cherokee to Concepcion-Martinez. This Jeep Grand Cherokee would be subject to forfeiture, and the Defendants sale allowed him to obtain currency which he could easily conceal from law enforcement. Not only was the Jeep Grand

Cherokee subject to forfeiture, but an inference can be drawn that the Defendant instructed or asked Concepcion-Martinez to lie to law enforcement for him and obstruct law enforcements search for him.

In sum, the Defendant's demonstrated history of flight from this Indictment and obstruction of justice justify his detention.

CONCLUSION

For the foregoing reasons, the government respectfully submits that the Defendants cannot rebut the government's proof that supports the presumption that "that no condition or combination of conditions will reasonably assure [his] appearance . . . as required and the safety of the community." 18 U.S.C. § 3142(e). Accordingly, the Defendants should be detained pending trial.

**RESPECTFULLY SUBMITTED**,

In San Juan, Puerto Rico, on December 1, 2023.

W. Stephen Muldrow
United States Attorney

/s/ Jorge L. Matos
Jorge L. Matos
USDC #G-01307
Assistant U. S. Attorney
 Torre Chardón, Suite 1201
350 Carlos Chardón Street
Hato Rey, Puerto Rico 00918
Tel: 787-766-5656
E-Mail: Jorge.L.Matos2@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the corresponding parties and by regular mail to the defendant at 5756 Hartford & Pointville Rd Joint Base MDL, NJ 08640.

/s/ Jorge L. Matos
Jorge L. Matos
Assistant U. S. Attorney
